2000 UT 43

**STATE of Utah, Plaintiff and Appellee,**

v.

**Alexander James BYBEE, Defendant and Appellant.**

No. 980248.

Supreme Court of Utah.

May 16, 2000.

petent jurisdiction.

Jan Graham, Att'y Gen., Kenneth A. Bronston, Christine Soltis, Asst. Att'ys Gen., Colin R. Winchester, Kanab, for plaintiff.

Floyd W. Holm, Cedar City, for defendant.

DURRANT, Justice:

¶ 1 Defendant-appellant Alexander Bybee ("Bybee") appeals a district court order denying a motion to suppress his confession. We affirm.

## BACKGROUND

¶ 2 In mid-August 1996, a six-year-old boy disappeared in Big Water, Kane County, Utah. The boy was last seen leaving the home of Bybee, who was then one week shy of his seventeenth birthday. On three separate occasions during the subsequent investigation, police unsuccessfully attempted to question Bybee about the boy. The first time, Bybee was playing a video game and would not stop long enough to focus his attention on the interview. The second time, Bybee would not leave his room, would not speak to the investigators, and yelled that he had already been interviewed enough. The third time, Bybee again refused to answer any questions and told investigators not to bother him unless they had a warrant.

¶ 3 A short while after the young boy's disappearance, Bybee moved to Las Vegas to live with his father. While there, Bybee became severely depressed and attempted suicide. Subsequently, Bybee's father had him admitted to a youth mental health facility run by the Southern Nevada Child and Adolescent Services Treatment Division, a.k.a, Children's Behavioral Services ("CBS"). At some point after Bybee was admitted, his father informed CBS personnel that Bybee had killed a young boy in Big Water, Utah. CBS called the Las Vegas police to report this information. That same day, the Las Vegas police relayed the information to Chief Deputy Alan Johnson of the Kane County Sheriff's Office.

¶ 4 Shortly thereafter, Deputy Johnson traveled to Las Vegas. After gaining permission from the Nevada Attorney General's Office to speak with Bybee, Deputy Johnson met with a group of CBS personnel concerning his desire to interview Bybee. This group included Dr. Robert Behrens, the psychologist working with Bybee. No one present at this meeting discouraged Deputy Johnson from interviewing Bybee. Dr. Behrens told Deputy Johnson that although Bybee was severely depressed he was not suffering from mental instability.

¶ 5 Following the meeting, Deputy Johnson questioned Bybee in an unlocked office located in a different building than the one in which Bybee resided. The office was chosen because it provided a more comfortable environment than Bybee's room. At the outset, Bybee refused to allow Deputy Johnson to take notes of, or tape record, the interview. After reading Bybee his *Miranda* rights, Deputy Johnson asked him whether or not he understood them and wished to waive them to discuss the missing boy. Bybee nodded his head in the affirmative. Bybee never requested an attorney. He did ask if his father could be present. Deputy Johnson refused this request.

¶6 The interview continued and Bybee confessed to killing the little boy. He also described where the boy's remains could be found and agreed to go to Utah to help locate the site if necessary. Deputy Johnson made no threats or promises to induce these statements. Bybee talked quietly, was very somber, and sobbed while discussing the killing. In Deputy Johnson's view, it appeared a great weight was being lifted from Bybee as he confessed.

¶7 Immediately after the interview, Deputy Johnson met with Bybee's father, who was then on CBS property. Deputy Johnson had not consulted with him prior to the interview. Deputy Johnson told Bybee's father about the interview and asked if he would assist in bringing Bybee to Utah to locate the burial site if necessary. Bybee's father agreed to the request and proved to be helpful in that regard. He helped arrange for Bybee's temporary release from CBS and accompanied Bybee, Deputy Johnson, and others from Las Vegas to Page, Arizona, where Bybee's father remained while Bybee and others went on to Big Water. Once in Big Water, Bybee led officers to the burial spot.

¶8 The State of Utah charged Bybee with murder, in violation of Utah Code Ann. § 76–5–203 (1999), and the case was set for jury trial in the Sixth District Court, Judge K.L. McIff presiding. Prior to trial, Bybee moved to suppress his confession on the grounds that he did not knowingly and voluntarily waive his *Miranda* rights, and that Deputy Johnson violated rule 8(d) of the Utah Rules of Juvenile Procedure. The trial court concluded that Bybee's waiver of his *Miranda* rights was valid and denied his motion on that basis. The trial court did not address the rule 8(d) question. Bybee then entered a conditional plea agreement, pleading guilty to the murder charge while reserving the right to appeal the trial court's decision on the motion to suppress. On appeal, Bybee reasserts both the rule 8(d) and the *Miranda* claims.

**1.** The State contends that the Rules of Juvenile Procedure do not apply at all in this case. Because we conclude that Bybee's interview clearly

## ANALYSIS

### I. UTAH RULE OF JUVENILE PROCEDURE 8(d)

¶9 Bybee argues his confession should be suppressed because Deputy Johnson violated Utah Rule of Juvenile Procedure 8(d), which states as follows:

> No person other than a probation officer or a staff member of a detention facility shall be permitted to interview a minor 14 years of age or older in a detention facility without the consent of the minor and the minor's parent, guardian or custodian after first advising said minor of constitutional rights as described in Rule 26 and such rights having been intelligently waived by the minor.

Utah R. Juv. P. 8(d). Bybee claims Deputy Johnson violated this rule by not obtaining the consent of his father prior to the interview.[1]

¶10 "The proper interpretation of a rule of procedure is a question of law, and we review the trial court's decision for correctness." *Ostler v. Buhler*, 1999 UT 99, ¶5, 989 P.2d 1073. As noted, the trial court did not rule on the rule 8(d) issue. Regardless, even had the trial court done so, under the "correctness" standard of review applicable here the ruling would have been entitled to no deference.

 ¶11 Rule 8(d) by its express terms applies only to interviews conducted in a "detention facility." The hospital in which Deputy Johnson interviewed Bybee clearly does not qualify as a "detention facility." First, neither the State of Utah nor its agents were in any sense detaining Bybee at CBS. Bybee's father had Bybee admitted to CBS and it was Bybee's father and CBS who controlled the conditions and duration of Bybee's stay. Indeed, Deputy Johnson had to obtain the permission of the Nevada Attorney General's office just to speak with Bybee.

¶12 Second, CBS does not fit within the definition of a "detention facility" as contemplated by the Utah Code. Although neither

did not take place in a "detention facility," we need not reach the question of the general applicability of the Rules of Juvenile Procedure.

rule 8 nor any other portion of the Utah Code precisely defines "detention facility," Utah Code title 62A, chapter 7, discusses certain characteristics of such a facility from which we can infer a definition. That chapter provides that a "detention facility" is established and maintained by the Division of Youth Corrections. *See* Utah Code Ann. § 62A–7–104(2) (1997) ("The division shall establish and maintain all detention and secure facilities...."). The Division of Youth Corrections did not establish and does not maintain CBS. Further, a "detention facility" is operated by or under contract with the Division of Youth Corrections. *See id.* § 62A–7–101(17) (" 'Secure detention' means predisposition placement in a facility operated by or under contract with the division ...."); *id.* § 62A–7–101(18) (" 'Secure facility' means any facility operated by or under contract with the division ...."); *id.* § 62A–7–201(6) (stating that some detention may be provided by "contract with a public or private agency willing to undertake temporary custody"). CBS is not operated by or under contract with the Department of Youth Corrections.

¶ 13 Bybee argues that Deputy Johnson impliedly contracted with CBS to detain him. Nothing in the record supports this bare allegation, however. The simple fact that CBS retained custody of Bybee after Deputy Johnson spoke with CBS personnel and heard Bybee's confession does not demonstrate that Deputy Johnson had anything to do with the terms and conditions of Bybee's stay at CBS, much less that these conversations created an implied contract.

¶ 14 Based on the foregoing, we find that CBS was not a "detention facility" for purposes of Utah Rule of Juvenile Procedure 8(d). Accordingly, rule 8(d) does not apply to Bybee's interview with Deputy Johnson and Bybee's first claim therefore fails.

## II. VALIDITY OF THE *MIRANDA* WAIVER

¶ 15 Bybee alleges he did not knowingly and voluntarily waive his *Miranda* rights before confessing to Deputy Johnson. He primarily bases his claim on the fact that his father was not present during the interview and the fact that he was being treated for severe depression at the time.

¶ 16 We review for correctness a trial court's ultimate ruling regarding the validity of a *Miranda* waiver, while "granting some degree of discretion to the trial court because of the wide variety of factual settings possible." *State v. Dutchie*, 969 P.2d 422, 427 (Utah 1998) (citation omitted); *see also State v. Ramirez*, 817 P.2d 774, 781–82 & n. 3 (Utah 1991). Of course, We review for clear error the trial court's findings of fact underlying the waiver. *See State v. Pena*, 869 P.2d 932, 935–36, 939 n. 4 (Utah 1994).

¶ 17 In order to determine whether *Miranda* rights were validly waived, we examine the totality of the circumstances surrounding the waiver. *See Dutchie*, 969 P.2d at 427. In the case of a juvenile, we have stated some of the relevant circumstances as follows:

> "[A] minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement."

*State v. Hunt*, 607 P.2d 297, 300 (Utah 1980) (quoting *People v. Lara*, 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202, 215 (1967)); *see also Dutchie*, 969 P.2d at 427. In addition, we consider whether the police used any coercive tactics in obtaining the waiver, and whether a parent, adult friend, or attorney was present. *See Dutchie*, 969 P.2d at 427, 429; *Hunt*, 607 P.2d at 300–01.

¶ 18 The trial court determined that some of the above factors weighed against finding the waiver to be valid and others weighed in favor of such a finding. Specifically, the trial court determined that the following facts weighed against finding the waiver to be valid: Bybee's depressed mental state, his level of education, his degree of experience with police, and the absence of his father from the interview. On the other hand, the

trial court determined that the following facts weighed in favor of finding the waiver to be valid: Bybee's age, the consent of CBS personnel to the interview, the relatively short length of the interview, Bybee's continuing with the interview after being read his *Miranda* rights, the lack of police coercion, Bybee's prior confession to his father, and his apparent desire to cleanse a guilty conscience. The trial court ultimately ruled that Bybee "was aware of his rights at the time [of the interview] and did not in any way resist the interview with the officer."

¶ 19 We affirm the trial court's holding that Bybee knowingly and voluntarily waived his *Miranda* rights. In doing so, we accept all the trial court's factual findings regarding the relevant circumstances surrounding the waiver. However, as discussed below, we disagree with the legal import the trial court gave to a few of its factual findings (i.e., whether a particular fact weighed for or against a finding of valid waiver).

¶ 20 First, as the trial court noted, Bybee was nearly seventeen and one-half years old at the time of the interview—less than seven months short of reaching his majority. Though not dispositive, a minor's age is an important factor. Indeed, based solely on his age, Bybee would be presumed capable of validly waiving his right to counsel under the Utah Rules of Juvenile Procedure. *See* Utah R. Juv. P. 26(e) ("A minor 14 years of age and older is presumed capable of intelligently comprehending and waiving the minor's right to counsel...."). On many occasions, this court has found older juveniles' waivers of *Miranda* rights to be valid. *See Dutchie*, 969 P.2d at 427–28, 430 (fifteen-year-old); *State v. Piansiaksone*, 954 P.2d 861, 863, 866 (Utah 1998) (sixteen-year-old); *State v. Hegelman*, 717 P.2d 1348, 1349–50 (Utah 1986) (seventeen years and nine and one-half months old); *State ex rel. T.S.V.*, 607 P.2d 827, 827–28 (Utah 1980) (seventeen-year-old); *Hunt*, 607 P.2d at 298 (sixteen years and eleven months old). Accordingly, Bybee's age supports the trial court's conclusion that the waiver was valid.

¶ 21 Second, although the trial court made no specific finding, the record indicates Bybee possessed sufficient intelligence to knowingly waive his rights. For example, Dr. Robert Behrens, Bybee's treating psychologist at CBS, testified at the suppression hearing that he thought Bybee "was of average intelligence." This supports the trial court's ruling that the waiver was valid.

¶ 22 Third, Bybee's education level does not indicate his waiver was invalid. The trial court found that Bybee dropped out of school in the tenth grade and made the legal conclusion that this fact weighed against finding a valid waiver. We disagree with that legal conclusion. Dropping out of school in the tenth grade does not suggest the type of substantially deficient education that would be of concern in the assessment of the validity of a waiver. Most seventeen-year-olds would not have significantly more education than did Bybee at the time of the interview. Indeed, other seventeen-year-olds would only be in the eleventh or twelfth grade. Furthermore, we have found valid waivers by juveniles with far less education than Bybee possessed. *See, e.g., Dutchie*, 969 P.2d at 428–30 (finding valid waiver of *Miranda* rights by a fifteen-year-old who read at a second-or third-grade level). The trial court's findings regarding Bybee's education support its conclusion that Bybee validly waived his rights.

¶ 23 Fourth, Bybee's prior experience with the police supports finding a valid waiver. The trial court found "no indication that [Bybee] ... had any prior substantial exposure to law enforcement" and made the legal conclusion that this fact weighed against finding a valid waiver. We disagree with that legal conclusion. Though perhaps lacking "substantial exposure to law enforcement," as the trial court found, the record indicates Bybee had at least some prior experience with police and exhibited a noteworthy degree of sophistication with respect to law enforcement officers. For instance, during the early investigation of the murder, Bybee twice refused to talk to police and once told them to leave him alone unless they had a warrant. Also, at the start of the CBS interview, Bybee refused to allow Deputy Johnson to take notes of, or tape record, the discussion. These incidents demonstrate that By-

bee was familiar with police methods and the limitations on those methods and was capable of asserting his will in the presence of law enforcement officers. In sum, we disagree with the trial court's legal conclusion that Bybee's previous experience with police weighs against finding a valid waiver. While Bybee's experience may not have been substantial, it is sufficient to lend support to the trial court's conclusion that Bybee validly waived his rights.

¶ 24 Fifth, we consider Bybee's ability to comprehend the meaning of the *Miranda* rights and the effect of their waiver. The *Miranda* rights include the suspect's right to remain silent, to know any statement he makes can be used against him in a court of law (i.e., the effect of waiving the rights), to have an attorney, and to have an attorney appointed if he cannot afford one. *See Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

¶ 25 The trial court found that Bybee understood his rights. The court appears to have based this conclusion primarily on the fact that there was no evidence of adolescent "fright" or "fantasy" on Bybee's part. The court did determine that Bybee showed some signs of "despair" but found that he did not confess for that reason.[2]

¶ 26 Beyond the trial court's express findings, the record contains facts illustrating Bybee's ability to comprehend his *Miranda* rights. Most significantly, Bybee himself testified at the suppression hearing that he

knew nothing "adverse" would result if he refused to talk to Deputy Johnson. This is clear evidence that Bybee comprehended his right to remain silent. In addition, Bybee's refusal to let Deputy Johnson take notes of, or tape record, the interview is strong evidence that Bybee was coherent and capable of understanding and asserting his rights.

¶ 27 To be sure, Bybee was not completely mentally healthy at the time of the interview. He had attempted suicide one month before, was being treated for depression, and, according to Dr. Behrens' testimony, was not thinking as clearly as he could have been.[3] However, we emphasize that our inquiry is not whether Bybee was in an optimal mental state, but whether he was able to understand his important, yet relatively simple *Miranda* rights. Such an understanding did not require that Bybee be completely mentally healthy. For example, in *Dutchie* we found that a fifteen-year-old with significant mental problems competently waived his *Miranda* rights. *See Dutchie,* 969 P.2d at 428 (minor had been diagnosed with attention deficit disorder, a developmental expressive language disorder, an oppositional defiant disorder, and four different psychotic disorders, one of which produced auditory hallucinations). In light of all the facts pertinent to this issue, the trial court did not err in finding that Bybee had the ability to understand the meaning of his *Miranda* rights and the effect of their waiver.

2. In assessing Bybee's ability to comprehend his *Miranda* rights, the trial court employed language from *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In *Gault,* the United States Supreme Court stated that when a juvenile confesses outside the presence of an attorney "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Id.* at 55, 87 S.Ct. 1428 (footnote omitted). For clarification, we note that this statement does not require a court to make specific findings regarding adolescent "fantasy, fright or despair" when assessing a juvenile's ability to understand his or her *Miranda* rights. First, the Supreme Court's comments are more illustrative than prescriptive. In fact, the juvenile's mental state was not even at issue in *Gault.* Second, the "totality of the circumstances" test

incorporates relevant aspects of "fantasy, fright or despair," yet more fully reveals whether a minor can comprehend and validly waive his or her *Miranda* rights, than would a test limited to an inquiry into the relatively abstract concepts of adolescent "fantasy, fright or despair."

3. Nonetheless, Dr. Behrens also testified that at the time of the interview, Bybee's condition had substantially improved since his admittance to CBS. For instance, Dr. Behrens concluded that Bybee's judgment had improved from a 2 to a 5 or 6, (on a scale of 1 to 10 with 10 being normal), and that Bybee's depression had improved from being in the top 25% of depressed people, in terms of severity, to being in the 50% range. Dr. Behrens further observed that Bybee was showing a greater interest in life and wanted to leave the CBS facility.

¶ 28 Sixth, the lack of coercion in the interview supports the trial court's conclusion that the waiver was valid. The trial court found that Deputy Johnson made no threats or promises to induce Bybee's waiver. Deputy Johnson held the interview in an unlocked room that provided a more comfortable setting than Bybee's residence at CBS. In addition, Deputy Johnson interviewed Bybee alone and for only one hour. In short, Bybee has not expressly alleged Deputy Johnson coerced him and we can find nothing in the record that would support such an allegation. Moreover, the trial court found that Bybee wanted to confess in order to relieve himself of "the great weight of what he had done," not because of any coercion.[4] The record supports this finding. Deputy Johnson testified that while confessing to the murder, Bybee sobbed and appeared as though a great weight was being lifted from him. That observation is supported by Dr. Behrens' testimony that Bybee was not a conscienceless psychopath unlikely to benefit from confessing, but, rather, possessed "empathy and understanding and feeling for other folks." Dr. Behrens also opined that Bybee's crime may have contributed to his depression and that his confession could have contributed to his eventual recovery. In sum, no evidence indicates that Deputy Johnson coerced Bybee's waiver, but substantial evidence exists demonstrating that Bybee confessed to relieve feelings of guilt. This supports the trial court's ruling that Bybee validly waived his *Miranda* rights.

¶ 29 Finally, we consider the fact that Bybee did not have a parent, adult friend, or attorney present during the interview. The trial court found that Bybee asked for his father early in the interview, prior to confessing, but Deputy Johnson refused the request. It is impossible to know what effect on Bybee, if any, his father would have had if present. Given that it was he who had originally informed CBS that his son had killed a young boy, it is arguable whether Bybee's father would have altered the interview's course. Bybee's father did not appear to object to the interview or its results when he spoke with Deputy Johnson immediately thereafter. In fact, Bybee's father was helpful in arranging for Bybee's temporary release from CBS in order to locate the child's burial site and even accompanied the search party from Las Vegas to Page, Arizona. Regardless of such speculation, the fact remains that Bybee's father was not present. That fact does not render Bybee's waiver invalid, however. As we stated in *Dutchie*, "while the presence of a parent or an attorney is a factor that should be considered by the court, it is not determinative, and the lack thereof does not make the waiver invalid per se." *Dutchie*, 969 P.2d at 429; *see also Hunt*, 607 P.2d at 300 ("We are not persuaded ... that a child is necessarily incompetent to waive his rights because of his infancy; nor do we agree that such a choice should lie with a child's parent, adult friend or attorney." (footnote omitted)); *cf.* Utah R. Juv. P. 26(e) ("A minor 14 years of age and older is presumed capable of intelligently comprehending and waiving the minor's right to counsel ... and may do so where the court finds such waiver to be knowing and voluntary, whether the minor's parent, guardian or custodian is present.").

¶ 30 We conclude that, based on the totality of the circumstances, the trial court did not err in holding that Bybee knowingly and voluntarily waived his *Miranda* rights. At the time of his confession he was almost seventeen and one-half years old, of average intelligence, possessed of a ninth grade edu-

---

4. So long as no coercion exists, a discussion of Bybee's actual motivation for waiving his rights and confessing is not required. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (quoting *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). However, identifying the existence of a readily apparent, legiti-

mate motivation often adds support to a finding that an individual did not waive his or her rights due to coercion. *See, e.g., State v. Mabe*, 864 P.2d 890, 894 (Utah 1993) (stating defendant's decision to confess "resulted from his own guilty conscience, not from coercion"); *State v. Bishop*, 753 P.2d 439, 464 (Utah 1988) (while discussing the lack of coercion, the court noted that defendant's "motive for confessing was to expiate his guilty conscience").

cation, sufficiently experienced with the police, capable of understanding his *Miranda* rights, and he was not coerced into waiving those rights. We therefore affirm the trial court's ruling.

### CONCLUSION

¶ 31 We hold that Utah Rule of Juvenile Procedure 8(d) does not apply to the instant case because CBS is not a "detention facility" as contemplated by the Utah Code. Further, under the totality of the circumstances test, the trial court correctly held that Bybee knowingly and voluntarily waived his *Miranda* rights prior to confessing. We affirm the trial court's refusal to suppress Bybee's confession.

¶ 32 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM and Justice WILKINS concur in Justice DURRANT's opinion.