136 P.3d 1230 (2006)
2006 UT App 74
STATE of Utah, in the interest of K.M., a person under eighteen years of age.
K.M., Appellant,
v.
State of Utah, Appellee.
No. 20040131-CA.
Court of Appeals of Utah.
February 24, 2006.
Rehearing Denied May 30, 2006.
*1231 Edward K. Brass, Salt Lake City, for Appellant.
Mark L. Shurtleff, Atty. Gen., and Joanne C. Slotnik, Asst. Atty. Gen., Salt Lake City, for Appellee.
Before Judges BILLINGS, ORME, and THORNE, Jr.

OPINION
THORNE, Jr., Judge:
¶ 1 K.M., a juvenile, admitted to one count of child abuse homicide, a third degree felony if committed by an adult. See Utah Code Ann. § 76-5-208 (2003). K.M. appeals, challenging the juvenile court's denial of her motion to withdraw that admission. We affirm.

FACTUAL BACKGROUND
¶ 2 On or about September 4, 2002, fifteen-year-old K.M. gave birth to a four-pound infant boy in the basement bathroom of her home. K.M. failed to summon help or otherwise attempt to keep the infant alive. Instead, she secreted the baby in the bathroom's window well. She later informed her mother of the baby's existence, and he was found dead in the window well.
¶ 3 The State brought a delinquency charge of murder, a first degree felony if committed by an adult, against K.M. for the death of the infant. See Utah Code Ann. § 76-5-203 (2003). One day into her trial, K.M. and the State reached an agreement to resolve the matter, and K.M. entered an admission to an amended charge of child abuse homicide, a third degree felony if committed by an adult. See id. § 76-5-208.
*1232 ¶ 4 The juvenile court, with the assistance of K.M.'s counsel, then conducted an admission colloquy pursuant to Utah Rule of Juvenile Procedure 25. K.M. was informed of and waived her trial rights, and she asserted to the court that she understood what she was doing and that she was not acting under any coercion. The court read K.M. the elements of the offense of child abuse homicide and asked her to admit or deny that on or about September 4, 2002, she, acting "with criminal negligence[,] caused the death of a person under 18 years of age and the death result[ed] from child abuse." K.M. admitted this offense.
¶ 5 The juvenile court then took a statement from K.M. to establish a factual basis for her admission. K.M. told the court in great detail about the events surrounding the child's birth and her actions thereafter. She explained that she did not know that she was pregnant and thought that she was merely having severe menstrual cramps. At some point she went into the bathroom and felt an "urge to push" and a "little body fell into [her] arms." The baby was not moving and K.M. pinched off the umbilical cord. K.M. did not want to put the baby on the toilet seat or the cold floor, so she opened the basement window and placed him in the window well. She watched him for five or ten seconds, and he remained motionless. She then attempted to clean herself up, and more than once she lost consciousness due to blood loss. K.M.'s mother discovered her and called an ambulance, which took K.M. to the hospital. At the hospital, K.M. admitted to her mother that she had given birth and placed her baby in the window well.
¶ 6 K.M. admitted to the juvenile court that she could have, and should have, summoned her aunt to assist her and the baby at the time of the birth. Her aunt, a licensed nurse with thirteen years of experience in newborn intensive care, was present in the home on the night of the birth and had been caring for K.M. throughout the evening.
¶ 7 K.M. testified that the baby never made a noise and was not breathing. At that point, the juvenile court asked if there was any evidence that the baby was born alive, and both the prosecutor and K.M.'s counsel responded that there was. K.M., however, would not admit to the court that the baby was born alive. Nevertheless, in light of the rest of K.M.'s testimony and the medical evidence identified by the parties' counsel, the juvenile court determined that there was a factual basis for K.M.'s admission to one count of child abuse homicide. The court then accepted the admission.
¶ 8 Prior to disposition, and after speaking with either a probation officer or a presentence investigator, K.M. filed a motion to withdraw her admission. The motion stated four grounds:
1. [K.M.] alleges that she was unaware that she was admitting to causing the death of the child who is the subject of this action.
2. [K.M.] alleges that she was pressured or coerced into admitting the amended allegation.
3. [K.M.] alleges that she believed the disposition in this case was guaranteed and not subject to the Court's discretion.[[1]]
4. [K.M.] alleges that she understood little or none of the colloquy with the Court or her counsel at the time of her admission.
The juvenile court heard testimony and argument on K.M.'s motion at the January 16, 2004 disposition hearing. K.M. testified that she had understood all of the rights that she waived at the admission hearing except for the right against self-incrimination. She also testified that she did not understand a lot of the "big words" used at the admission hearing, and that she felt she had been coerced into entering the admission. K.M.'s therapist also testified at the hearing.
¶ 9 At the conclusion of the testimony, the juvenile court heard arguments from both parties and took a short recess to allow the judge to review her notes and pertinent caselaw. When the court reconvened shortly thereafter, it denied K.M.'s motion, finding that K.M. had made a knowing and voluntary admission to the crime of child abuse homicide. Disposition followed immediately *1233 thereafter, and the court imposed and suspended thirty days of detention and placed K.M. on probation, ordering her to participate in various programs and complete 250 hours of community service. K.M. now appeals.

ISSUE AND STANDARD OF REVIEW
¶ 10 The only issue on appeal is the propriety of the juvenile court's denial of K.M.'s motion to withdraw her admission. We review a juvenile court's denial of a motion to withdraw an admission for abuse of discretion. See State v. Beckstead, 2004 UT App 338, ¶ 5, 100 P.3d 267, cert. granted, 109 P.3d 804 (Utah 2005). Factual findings made by the juvenile court in conjunction with its denial of a withdrawal motion are reviewed under the clearly erroneous standard, while its legal conclusions are reviewed for correctness. See id.

ANALYSIS
¶ 11 K.M. challenges the juvenile court's denial of her motion to withdraw her admission to child abuse homicide, a third degree felony if committed by an adult. See Utah Code Ann. § 76-5-208. We conclude that the juvenile court properly determined that K.M.'s admission was knowing and voluntary, and that it did not exceed the bounds of its discretion when it denied K.M.'s motion to withdraw that admission.

I. Rule 11 Caselaw Applicable
¶ 12 As a preliminary matter, we note that there appears to be little or no caselaw specifically analyzing the admission requirements of rule 25 of the Utah Rules of Juvenile Procedure. See Utah R. Juv. P. 25. Both parties cite extensively to criminal cases analyzing rule 11 of the Utah Rules of Criminal Procedure to support their respective positions. See Utah R.Crim. P. 11. We agree with the parties that rule 11 cases are a persuasive source of authority to guide our interpretation and application of rule 25,[2] an approach this court has taken in other juvenile court contexts. See In re S.A., 2001 UT App 308, ¶ 36, 37 P.3d 1172 (employing Utah Rule of Criminal Procedure 22 caselaw to interpret similar provision in rule 54 of the Utah Rules of Juvenile Procedure); In re W.S., 939 P.2d 196, 200-01 (Utah Ct.App. 1997) (applying Utah Rules of Evidence caselaw to rule 46(b) of the juvenile rules, which allows the admission of reliable hearsay).
¶ 13 Applying the rule 11 cases, certain principles and considerations governing juvenile admissions under rule 25 become apparent. Rule 25 is intended "to ensure that [juveniles] know of their rights and thereby understand the basic consequences of their decision to [admit to an allegation]." State v. Visser, 2000 UT 88, ¶ 11, 22 P.3d 1242. Juvenile courts have a duty to "personally establish that the [juvenile's admission] is truly knowing and voluntary and establish on the record that the [juvenile] knowingly waived his or her constitutional rights." State v. Corwell, 2005 UT 28, ¶ 11, 114 P.3d 569 (quotations and citation omitted). While the juvenile court has a duty to strictly comply with rule 25, see Visser, 2000 UT 88 at ¶ 11, 22 P.3d 1242, "strict compliance does not mandate a particular script or rote recitation of the rights listed." State v. Dean, 2004 UT 63, ¶ 9, 95 P.3d 276 (quotations and citation omitted).
¶ 14 Of particular relevance here, a juvenile must be afforded the opportunity to withdraw her admission if it can be shown that she lacked understanding or knowledge of the consequences of her plea, or that her plea was involuntary. See Utah R. Juv. P. 25; State v. Martinez, 2001 UT 12, ¶¶ 21-25, 26 P.3d 203. "Withdrawal `is a privilege, not a right, that is left to the [juvenile] court's sound discretion.'" Dean, 2004 UT 63 at ¶ 11, 95 P.3d 276 (quoting State v. Gallegos, 738 P.2d 1040, 1041 (Utah 1987)). In reviewing a juvenile court's denial of a motion to withdraw an admission, this court is not limited to a review of the denial of the motion itself *1234 and "may consider the record of the plea proceedings, including the plea colloquy and plea affidavit or statement." Id. at ¶ 12.

II. K.M.'s Motion to Withdraw
¶ 15 Turning now to K.M.'s arguments on appeal, K.M. argues generally that her admission was not knowing and voluntary. Specifically, she argues that she was not informed of her right to testify at trial and did not waive that right at the admission hearing. K.M. also argues that she did not admit to facts sufficient to support an admission of child abuse homicide because she never admitted that the baby was born alive. Finally, K.M. argues that her testimony at the withdrawal hearing established various other infirmities in her understanding at the time of her admission, rendering her admission unknowing and involuntary.

A. Failure to Preserve
¶ 16 K.M.'s arguments that she did not knowingly waive her right to testify at trial, and that she did not admit that her child was born alive, were not preserved below. K.M.'s motion to withdraw did not raise either of these issues. As the Utah Supreme Court explained in State v. Dean, attacks on the sufficiency of a guilty plea are not preserved for appeal when the "motion to withdraw and the asserted grounds therefor fail[ ] to put the trial court on notice of the alleged error." 2004 UT 63, ¶ 14, 95 P.3d 276.
¶ 17 The motion's assertion that K.M. "was unaware that she was admitting to causing the death of [her] child" did not raise the issue of inadequate factual basis. Instead, this assertion implied that K.M. had admitted to causing the baby's death, but had done so unwittingly. Similarly, her allegation "that she understood little or none of the colloquy" did not directly or specifically put the juvenile court on notice that her right to testify at trial had not been properly addressed and waived at the colloquy. Further, at the withdrawal hearing, K.M.'s counsel affirmatively conceded that the court had "go[ne] through the proper colloquy" and that there was therefore a presumption that K.M.'s admission was knowing and voluntary. See State v. Thorup, 841 P.2d 746, 748 (Utah Ct.App.1992).
¶ 18 As in Dean, K.M. "did not sufficiently bring the[se] issue[s] to the court's attention in [her] motion to withdraw." 2004 UT 63 at ¶ 14, 95 P.3d 276. Accordingly, if we are to reach these issues, it is only through the plain error doctrine. See id. We are unable to do so here. K.M.'s appellate argument in favor of applying the plain error doctrine is itself inadequate to properly raise the issue.[3]See, e.g., State v. Gomez, 2002 UT 120, ¶ 29, 63 P.3d 72 (discussing the circumstances under which briefing will be deemed inadequate). K.M.'s appellate briefing does not address whether the alleged errors should have been obvious to the juvenile court, or whether K.M. suffered harm in the sense that she would have refused to enter the admission had the errors not occurred. Both obviousness and harm are required elements of the plain error doctrine. See Dean, 2004 UT 63 at ¶¶ 15-22, 95 P.3d 276. In the absence of reasoned argument and authority to the contrary, we must assume that the alleged errors were neither plain nor harmful.

B. K.M.'s Admission
¶ 19 Foreclosing the issues that K.M. raised on appeal but failed to preserve below, we are left with a generalized challenge to the juvenile court's denial of K.M.'s withdrawal motion, based solely on her subsequent allegations that her admission was not knowing and voluntary. We address K.M.'s argument from the starting point that her admission was taken in compliance with rule 25 of the Utah Rules of Juvenile Procedure. *1235 [4] There is, therefore, a presumption that her admission was knowing and voluntary. See State v. Humphrey, 2003 UT App 333, ¶ 10, 79 P.3d 960; see also Thorup, 841 P.2d at 748. We conclude that the juvenile court acted within the bounds of its discretion in finding that K.M. did not rebut this presumption in her motion to withdraw or the accompanying hearing.
¶ 20 K.M. testified at the admission colloquy that she understood and voluntarily waived her constitutional rights; that no one forced her to enter the admission; and that she admitted that she, acting "with criminal negligence[,] caused the death of a person under 18 years of age and the death result[ed] from child abuse." She also gave the juvenile court a lengthy factual narrative describing her recollection of the birth of her child. She recounted how she gave birth to a "little body" and that it did not move, make a sound, or breathe. And she testified that she could have and should have sought help from her aunt, a former newborn intensive care nurse, who was in the house caring for K.M. throughout the night.
¶ 21 In her motion to withdraw, K.M. made several assertions that directly contradicted her admission hearing testimony. She claimed that she did not know that she was admitting to causing the death of her child, that she was pressured or coerced into admitting the allegation, and that she understood little or none of the colloquy at the time of her admission. At a hearing in support of her motion, K.M. testified that there were "big words" in the colloquy that she did not understand at the time. Nevertheless, she testified that she understood every specific right identified in the colloquy except for the right against self-incrimination. She testified that, although she had been strongly advised by her parents to admit the allegation, that no one had forced her to do so. And she testified that she had admitted only to neglecting "a little body" and failing to call for help or seek medical attention.
¶ 22 Assuming that the juvenile court gave credence to K.M.'s testimony at the withdrawal hearing, that testimony is not necessarily inconsistent with her testimony at the admission hearing. K.M. claimed that she did not understand what she was doing at the admission hearing because the juvenile court used "big words." Yet, she also claimed to have understood her right to trial, her right to confront and cross-examine opposing witnesses, and her right to testify and to have process for the attendance of witnesses. See Utah R. Juv. P. 25.
¶ 23 The only right enumerated in rule 25 that K.M. claimed not to have understood was the right against self-incrimination, which she defined at the withdrawal hearing as "the right to take back [her] plea." However, the right against self-incrimination was explained to K.M. in three different ways at the admission hearing: that she could not "under any circumstances, be forced to incriminate [her]self;" that she could not "be compelled to give evidence against [her]self;" and that she would be giving up the right "by making an admission today" because she would "have to tell [the court] what happened." K.M.'s withdrawal hearing testimony did nothing to obviate her previous assertion that she understood these less formal, yet perfectly valid, expressions of her Fifth Amendment right. See State v. Corwell, 2005 UT 28, ¶ 12, 114 P.3d 569 (stating that strict compliance with rule 11 does not require a particular script); State v. Visser, 2000 UT 88, ¶ 11, 22 P.3d 1242 ("[T]he substantive goal of rule 11 . . . should not be overshadowed or undermined by formalistic ritual.").
¶ 24 At the withdrawal hearing, K.M. gave some incorrect or nonsensical definitions of other legal terms: "the right to remain silent," "the right to have the case proven beyond a reasonable doubt," and "confidentiality." *1236 However, these terms were not used at the admission hearing. While her apparent inability to correctly define these terms may support some inference about K.M.'s intelligence or education level, it is not necessarily inconsistent with her previous understanding of the different terms presented to her at the admission hearing. And nothing at the withdrawal hearing suggested[5] that K.M. was not aware that she was being asked to verify her understanding of the various "big words" presented to her. To the contrary, she admitted that she knew she was lying to the juvenile court when she said she understood her rights.
¶ 25 Similarly, K.M.'s withdrawal hearing testimony did not contradict, but rather confirmed, her colloquy testimony that no one had forced her to enter her plea. K.M. also confirmed at the withdrawal hearing that she had neglected her baby by failing to seek help from her aunt or otherwise seek medical attention for the newborn. Child abuse homicide requires only criminally negligent abuse resulting in the death of a minor, and K.M.'s testimony is not inconsistent with the elements of that crime.[6]
¶ 26 For these reasons, the juvenile court did not abuse its discretion in denying K.M.'s withdrawal motion even if it found K.M.'s withdrawal hearing testimony to be credible. However, the court could also have simply found K.M.'s withdrawal hearing testimony to be incredible. When it comes to factual matters, "`we defer to the juvenile court because of its advantageous position with respect to the parties and the witnesses in assessing credibility and personalities.'" In re S.Y., 2003 UT App 66, ¶ 11, 66 P.3d 601 (quoting In re G.B., 2002 UT App 270, ¶ 9, 53 P.3d 963).[7] K.M.'s withdrawal hearing testimony was at best self-serving and at worst approached the absurd. K.M.'s credibility at the withdrawal hearing was further undermined by the very purpose of her appearance there: to convince the juvenile court that she had already lied to the court at the admission hearing. Under these circumstances, there is nothing in the record that would cause us to depart from our traditional deference to the juvenile court's credibility determinations.

CONCLUSION
¶ 27 We conclude that K.M. did not preserve any issues for appeal that necessitate reversal of the juvenile court's denial of her withdrawal motion. We grant great deference to the juvenile court's credibility determinations, and one explanation for the denial of K.M.'s motion is that the juvenile court simply did not believe her testimony at the withdrawal hearing. However, even assuming that K.M.'s later testimony was credible, there is nothing in that testimony that necessarily defeats the presumption that her admission *1237 was knowing and voluntary.[8] Accordingly, the juvenile court acted within the bounds of its discretion when it denied K.M.'s motion to withdraw.
¶ 28 Affirmed.
¶ 29 I CONCUR: JUDITH M. BILLINGS, Judge.
ORME, Judge (dissenting):
¶ 30 K.M.'s appeal raises a salient and troubling issue: Whether colloquies in juvenile courts under rule 25 of the Utah Rules of Juvenile Procedure require the use of "kid gloves," as it were, to assure that minors, because of their tender years and lack of knowledge and experience, have been properly informed of their legal rights before being allowed to waive those rights and enter an admission to an alleged offense.[1] In my view, K.M.'s arguments on appeal and the State's counter-arguments ultimately require this court to return to the colloquy that took place before K.M. admitted to the allegation of child abuse homicide, examine the colloquy's adequacy, and decide whether it complies with rule 25. See Utah R. Juv. P. 25. Ultimately then, the outcome of this case turns on whether the exchange that took place between K.M., the juvenile court, and K.M.'s attorney adequately informed K.M. and established that she knowingly and voluntarily waived certain important rights and that she voluntarily admitted to the allegation of child abuse homicide. My colleagues insist that the exchange was adequate. I must disagree.
¶ 31 Rule 25 outlines what is required for the entry and acceptance of pleasknown as admissionsin the juvenile court. See Utah R. Juv. P. 25. The rule states, in relevant part, that
[t]he [juvenile] court may refuse to accept an admission or a plea of no contest and may not accept such plea until the court has found:
....
(c)(2) that the plea is voluntarily made;
(c)(3) that the minor ... ha[s] been advised of, and the minor has knowingly waived, the right against compulsory self-incrimination, the right to trial, the right to confront and cross-examine opposing witnesses, the right to testify and to have process for the attendance of witnesses;
(c)(4) that the minor ... ha[s] been advised of the consequences which may be imposed after acceptance of the plea of guilty or no contest; [and]
(c)(5)that there is a factual basis for the plea;
....
Utah R. Juv. P. 25(c). The substance of the safeguards contained in rule 25 reflects the well settled principle "that juvenile court procedures must conform to the fundamental requirements of due process and fair treatment." In re L.G.W., 641 P.2d 127, 129 (Utah 1982). See also In re Lindh, 11 Utah 2d 385, 359 P.2d 1058, 1059 (1961). In other words, rule 25 merely codifies what juvenile courts are legally obligated to find, before accepting a minor's admission of guilt, in order to protect important constitutional rights that have been extended to youthful offenders in juvenile court proceedings. See, e.g., In re Gault, 387 U.S. 1, 31-57, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (extending to juveniles the constitutional safeguards of notice of charges, right to counsel, rights of confrontation and cross-examination, and privilege against self-incrimination); In re Winship, 397 U.S. 358, 368, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (applying proof beyond a reasonable doubt standard to juvenile courts). But see McKeiver v. Pennsylvania, 403 U.S. 528, 545-51, 91 S.Ct. 1976, 29 *1238 L.Ed.2d 647 (1971) (refusing to extend the constitutional right to a trial by jury to offenders tried in juvenile court).
¶ 32 Accordingly, under rule 25, before the juvenile court is able to accept an admission of guilt, the court must find that the juvenile's admission is "voluntarily made," the juvenile has been "advised of" and "knowingly waived" certain important constitutional rights, the juvenile has been "advised of the consequences which may be imposed," and "there is a factual basis" behind the juvenile's admission.[2] Utah R. Juv. P. 25(c). To date, however, our appellate courts have not specifically addressed what a juvenile court must do to comply with rule 25, nor have they articulated to what degree it must be established, when the juvenile later seeks to withdraw an admission on this basis, that a juvenile's waiver of rights and entry of an admission were knowing and voluntary.[3] Yet, given that the content of rule 25 is strikingly similar to that of rule 25's counterpart regarding the entry of pleas in the adult criminal systemrule 11 of the Utah Rules of Criminal ProcedureI agree that the case law articulating the standards for complying with rule 11 is instructive. Rule 11 case law is surely not, however, dispositive of what should likewise be required for juvenile courts to comply with rule 25 when dealing with underage offenders.
¶ 33 Much like the safeguards contained in rule 25, "the substantive goal of rule 11 is to ensure that defendants know of their rights and thereby understand the basic consequences of their decision to plead guilty." State v. Visser, 2000 UT 88, ¶ 11, 22 P.3d 1242. See Utah R.Crim. P. 11(e). Thus, the Utah Supreme Court has "placed the burden of complying with rule 11(e) on the district courts, requiring them to `personally establish that the defendant's guilty plea is truly knowing and voluntary and establish on the record that the defendant knowingly waived his or her constitutional rights.'" State v. Corwell, 2005 UT 28, ¶ 11, 114 P.3d 569 (quoting Visser, 2000 UT 88 at ¶ 11, 22 P.3d 1242). This burden imposed on the adult courts is "a duty of `strict' compliance" with rule 11. Visser, 2000 UT 88 at ¶ 11, 22 P.3d 1242. Because juvenile courts already have the burden under rule 25 of assuring a juvenile's admission is voluntary and that constitutional rights are knowingly waived, see Utah R. Juv. P. 25(c), applying the framework of the strict compliance standard in evaluating compliance with rule 25 is entirely appropriate.
¶ 34 Nevertheless, in imposing this duty of strict compliance on juvenile courts, it must be recognized, as is true in the district court, "that the substantive goal of rule [25] ... *1239 should not be overshadowed or undermined by formalistic ritual." Visser, 2000 UT 88 at ¶ 11, 22 P.3d 1242. Thus, "[a]lthough the phrase might suggest otherwise, strict compliance with rule [25] does not require that a [juvenile] court follow a `particular script' or any other `specific method of communicating the rights enumerated by rule [25].'" Corwell, 2005 UT 28 at ¶ 12, 114 P.3d 569 (quoting Visser, 2000 UT 88 at ¶ 13, 22 P.3d 1242). Instead, "`strict compliance can be accomplished by multiple means so long as no requirement of the rule is omitted and so long as the record reflects that the requirement has been fulfilled.'" Id. (citation omitted).
¶ 35 Ultimately then, as in the adult courts, "the test of whether a [juvenile] court strictly complies with rule [25] is not whether the court recites the phrases found in that rule[,]... [but] whether the record adequately supports the [juvenile] court's conclusion that the [juvenile] had a conceptual understanding of each of the elements of rule [25]." Id. at ¶ 18. In other words, whether the court strictly complied with rule 25 and "whether a [juvenile] was provided with a sufficient understanding of rule [25] rights" will "`necessarily turn[] on the facts of each case.'" Id. at ¶ 12 (citation omitted).
¶ 36 As this case illustrates, however, the guidance that Rule 11 case law provides has its limits. If I were to analyze the facts of this case and the plea colloquy under case law articulating what is factually sufficient to show strict compliance with rule 11 in the district courts, I would likely agree with my colleagues that the juvenile court strictly complied with rule 25 and, therefore, that K.M. knowingly and voluntarily entered her admission. Indeed, on the face of the record, K.M.'s admission appears to be voluntary. For the most part, her attorney and the juvenile court asked the right questions to establish on the record that K.M. understood the consequences of her admission and, in response, K.M. gave all of the right yes or no answers. In fact, there is little in the record, aside from K.M.'s age and lack of sophistication, to indicate that anything occurred during the actual plea colloquy that would have put the court on notice that K.M. did not understand what was taking place.
¶ 37 What emerged during K.M.'s later testimony, however, gives me considerable pause about the adequacy of this particular plea colloquy.[4] When K.M. was finally asked to give more than simple yes or no answers to questions about the important constitutional rights she was waiving, K.M. proved quite inept at formulating even partially correct responses. For example, K.M. offered absurd answers to explain what the "right against self-incrimination," the "right to remain silent," and "proven beyond a reasonable doubt" meant, defining those terms as, respectively, "I don't know that I could take back the plea I guess," "I thought I could never talk again," and "for a trial to come." Each answer is so far off the mark as to belie the notion that those rights were ever knowingly waived or that K.M. even understood any of the other questions to which she gave yes or no answers.[5]
*1240 ¶ 38 My skepticism as to whether K.M.'s admission was knowing and voluntary is heightened by the fact that K.M. had little prior experience with law enforcement or the juvenile court systeminexperience that was evident to and acknowledged by the court which is compounded by the fact that she was only sixteen years old at the time of the hearing. On top of that, K.M. was understandably quite emotional throughout the proceedings, facing the pressure of severe criminal charges and trying to abide by the advice she was receiving from her parents, religious leaders, and attorneys about everything that was taking place. She admittedly was also trying to save face and not "sound stupid" when she gave what she thought were the right yes or no answers to the questions put to her. Moreover, K.M. has learning disabilities, necessitating special attention and resource classes at school.
¶ 39 In denying the motion to withdraw, the juvenile court openly acknowledged some of K.M.'s limitations. It stated:
[K.M.] is a 16 year old, almost 17 year old young lady who, this is the first time before juvenile court. She doesn't have a lot of experience with law enforcement. She doesn't have a lot of experience in the courtroom. That's clear every time she's come into this courtroom and it's clear today.
The court further observed that K.M. obviously did not understand "a lot of legal terminology." But the court reasoned that "[n]ot many people do." Thus, the court recognized K.M.'s youth and inexperience and the fact that K.M. did not understand all of the legal terminology describing important constitutional rights she was waiving by entering her admission. The court also recognized the propriety of a kid-tailored explanation when it noted that "in juvenile court we don't always use all of the terminology the same as in the adult system[,][a]nd we make sure that kids understand what is going on." The juvenile court nevertheless found that K.M. "knowingly and voluntarily entered into an admission." In sum, the juvenile court was persuaded by its review of the plea colloquy record that rule 25 had been satisfied when the admission was entered. My colleagues agree.[6] I am not so persuaded.
¶ 40 On the contrary, the facts of this case suggest that in order to ensure strict compliance with rule 25, the juvenile court must consider some specific additional circumstances to account for the unique characteristics of the juvenile court system, the minors who appear before it, and the effect the *1241 combination of the two have on the "voluntary and knowing" aspect of admissions entered in juvenile court. Thus, what is factually sufficient in an adult criminal court to show that a defendant had a sufficient understanding of constitutional rights and of the consequence of a guilty plea is not necessarily sufficient in the juvenile court context.
¶ 41 Although I do not purport to set forth an exhaustive list of circumstances to consider as part of the totality surrounding such an admission, this case raises the relevance of at least five circumstances a juvenile court must take into account when determining whether an admission entered by a juvenile is knowing and voluntary: (1) the age of the juvenile, (2) the relative intelligence of the juvenile, (3) the juvenile's experience with law enforcement or the legal system, (4) the juvenile's emotional state at the time of the admission, and (5) the outside pressure of parents, counselors, attorneys, etc., on the juvenile's decision. Moreover, the key to demonstrating a juvenile's actual understanding of the important rights being reviewed during the plea colloquy will be reliance on open-ended, rather than yes or no, questions.
¶ 42 The propriety of requiring consideration of such circumstances to determine whether juvenile admissions are knowingly and voluntarily entered under rule 25 is buttressed by the fact that similar circumstances are considered in other contexts involving a juvenile's waiver of constitutional rights. For example, in the context of a minor's waiver of the right to counsel, "[t]hough not dispositive, a minor's age is an important factor" under the Utah Rules of Juvenile Procedure. State v. Bybee, 2000 UT 43, ¶ 20, 1 P.3d 1087. See Utah R. Juv. P. 26(e) (stating the presumption, however surprising, that minors fourteen years old and older are "capable of intelligently comprehending and waiving the minor's right to counsel"). In the similar context of a juvenile's waiver of Miranda rights, "some of the relevant circumstances" to consider when determining whether they were validly waived "`depend[] not on [her] age alone but on a combination of that factor with such other circumstances as [her] intelligence, education, experience, and ability to comprehend the meaning and effect of [her] statement.'" Bybee, 2000 UT 43 at ¶ 17, 1 P.3d 1087 (citations omitted).
¶ 43 Consequently, without a satisfactory showing that such circumstances do not impact the voluntariness of a juvenile's plea, we should more critically approach the question of whether an admission of guilt sought to be withdrawn by a juvenile prior to sentencing was indeed knowing and voluntary.[7] Thus, the State should have its work cut out for it in trying to convince this court that the strict compliance standard was met and that the admission was knowing and voluntary. As a practical matter, then, juvenile courts should more liberally grant motions to withdraw admissions when they are promptly made, prior to sentencing, and there is a plausible explanation offered as to why the juvenile may well not have understood his or her basic rights and, therefore, did not understand the fundamental consequences of the decision to admit to the allegations.
¶ 44 I must conclude that, in spite of the juvenile court's effort to conduct a meaningful colloquy that would satisfy and strictly comply with the constitutional requirements of rule 25, the colloquy was insufficient to establish K.M.'s knowing and voluntary waiver of important rights and her voluntary admission to the allegation of child abuse homicide. As a result, I would reverse and remand with instructions to grant K.M.'s motion *1242 to withdraw her admission and, for better or worse, permit her case to proceed to trial.
NOTES
[1] K.M.'s withdrew this issue in the juvenile court and it is not before us in this appeal.
[2] The applicability of rule 11 caselaw may be limited in certain circumstances, as when the adult and juvenile rules contain different express provisions, or when policy considerations mandate different results in the best interests of the child. See, e.g., In re E.R., 2000 UT App 143, ¶ 12, 2 P.3d 948 (noting that "in some contexts we have employed a more flexible standard when cases involve the best interests of children").
[3] K.M.'s companion argument that we should reach these issues under an ineffective assistance of counsel analysis is also inadequately briefed. Additionally, we note that she is barred from raising an ineffective assistance of counsel argument on direct appeal when her appellate attorney represented her below. See State v. Garrett, 849 P.2d 578, 580 n. 3 (Utah Ct.App.1993) ("An additional requirement to hearing an ineffective assistance claim on direct appeal is that the defendant must be represented by new counsel on appeal because it is unreasonable to expect [trial counsel] to raise the issue of his own ineffectiveness at trial on direct appeal." (alteration in original) (quotations and citation omitted)).
[4] As discussed above, K.M.'s counsel conceded to the juvenile court that her admission colloquy was proper. While we proceed on that concession, we note that the juvenile court failed to directly address K.M.'s right to testify at trial and that there was some lack of agreement between K.M. and the juvenile court as to the exact nature of the events surrounding her baby's death. We caution the juvenile court that these two aspects of the colloquy, had they been preserved as issues for appeal, represent potential flaws in an otherwise commendable colloquy. See State v. Visser, 2000 UT 88, ¶ 11, 22 P.3d 1242 (requiring plea colloquies to strictly comply with rule 11).
[5] Aside from the potential but unpreserved flaws discussed above, there is nothing in the record of K.M.'s admission hearing that would have placed the juvenile court on notice of the lack of understanding that K.M. later professed. Cf. State v. Beckstead, 2004 UT App 338, ¶¶ 10-11, 100 P.3d 267 (holding that the trial court erred when it refused to investigate defendant's capacity at plea hearing after court was placed on notice that defendant had been drinking), cert. granted, 109 P.3d 804 (Utah 2005). While K.M. was clearly emotional at her admission hearing, she was sixteen years old, represented by counsel, and interacted with the juvenile court in clear, conversational English. She affirmatively represented to the juvenile court that she understood the consequences of her admission and that she entered it voluntarily, and in the absence of notice to the contrary, the court could properly rely upon K.M.'s representations.
[6] K.M. expressed concern at the withdrawal hearing that a social worker had informed her that the crime she had admitted to consisted of actively abusing and killing her newborn infant. This is an incorrect interpretation of the relevant statutes. See Utah Code Ann. §§ 76-5-109, -208 (2003 & Supp.2005); Provo City v. Cannon, 1999 UT App 344, ¶¶ 5-14, 994 P.2d 206 (holding that child abuse need not be predicated on a physical impact upon a child, but rather upon any act that imperils or endangers a child's physical well-being). The child abuse required for conviction under Utah Code section 76-5-208 can be established by neglect or failure to act resulting in the death of a child, and it appears that such neglect is all that K.M. admitted.
[7] The dissenting opinion identifies at least five factors for juvenile courts to consider in evaluating whether a juvenile's admission is knowing and voluntary, including the juvenile's age, intelligence, and emotional state. These appear to be the very sorts of factors that juvenile judges already routinely rely upon, and we see no reason to mandate any particular list of factors.
[8] Although well-intentioned, the rule envisioned by the dissenting opinion could significantly alter the juvenile admission process. Unintended, but foreseeable, consequences of such a change might include uncertainty and undue complication at admission hearings, an inappropriate lessening of appellate deference towards the finality and gravity of admissions, and an outbreak of "buyer's remorse" amongst juvenile offenders upon realizing the implications of their admissions.
[1] This question, indeed, may fairly be posed: If a juvenile is too young to enter into a legally binding contract to purchase a set of tires, how can that same juvenile validly waive constitutional rights and enter into a legally binding plea agreement?
[2] While K.M. also asserts that the factual basis for the admission was lacking, I am convinced that the factual basis behind the admission was adequately established by the autopsy of the baby, K.M.'s statement to the court regarding the birth of the baby, and K.M.'s own attorney's concession that "there's no dispute about whether the baby was born alive[,][t]he puzzlement comes from what caused the baby to die."
[3] While the State suggests that the laws governing our juvenile courts are silent about a minor's ability to withdraw an admission, it goes without saying that such a withdrawal is nonetheless allowed. It is true that no Utah rule, statute, or judicial opinion expressly gives juveniles the right to withdraw admissions. Yet, while our juvenile court system is a creature of statute and most of the rights extended to juveniles in that context only exist to the extent they have been created by our Legislature, the constitutional nature of the rights a juvenile waives by entering an admission nonetheless dictates that the opportunity for withdrawal of an admission is availableeven requiredin certain situations. Indeed, because the entry of an admission operates to waive "several federal constitutional rights,... if a [juvenile's admission] is not ... voluntary and knowing, it has been obtained in violation of due process and is therefore void." Boykin v. Alabama, 395 U.S. 238, 243 n. 5, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (internal quotations and citation omitted). It logically follows that if an admission is not knowingly or voluntarily entered, or if a juvenile court does not abide by rule 25's commands, the infirm admission is naturally remedied by its withdrawal. Thus, as in the adult criminal context, if a juvenile did not have full knowledge and understanding of the consequences of her admission, it is an abuse of discretion to deny her motion to withdraw the admission. See State v. Vasilacopulos, 756 P.2d 92, 95 (Utah Ct.App.), cert. denied, 765 P.2d 1278 (Utah 1988). And even without considering constitutional guaranties, rule 25 itself implies that withdrawal is a possibility. See Utah R. Juv. P. 25(c) (stating that the juvenile court "may not accept [an admission] until the court has found," among other things, the voluntariness of the plea and the knowing waiver of constitutional rights).
[4] It is not at all unusual to have a plea appear to be perfectly in order at the time of the plea, only later to have it established at a hearing on a motion to withdraw the plea that the plea was not knowing and voluntary. For example, a hardened alcoholic might very well appear completely normal at the time he enters a pleaa talent developed through years of heavy drinkingwhen, in fact, he is drunk out of his gourd. He gives all the correct answers to questions designed to establish that his plea is knowing and voluntary. He even answers in the negative when asked if he is currently under the influence of drugs or alcohol. Yet, a court would certainly allow such a defendant to withdraw his plea if he subsequently establishes, in a moment of sobriety, that he had, in fact, imbibed an entire bottle of Jack Daniel's Tennessee Whiskey for breakfast before appearing in court and entering his plea. The same is true of someone later shown to have been in the throes of certain kinds of mental illness or to have been acting under duress at the time of the plea.
[5] In fact, K.M. proved just how easy it is for juveniles to fly under a juvenile court's radar when all they are required to say to "knowingly" waive constitutional rights is "yes" or "no." The leading yes or no questions put to K.M. did nothing to establish that she actually understood anything about her constitutional rights. Instead, the questions only guided K.M. to the correct affirmative or negative responsesor at least to the responses she sensed her attorney and the court wanted to hear.

For example, in a couple of instances K.M.'s attorney explained rights to K.M. and then virtually suggested the answer to K.M., saying things like, "you understand that as well; correct?" or "you're going to give up certain important rights. Right?" The court followed its explanation of rights with the question, "Do you understand that?" While not as leading, the court's inquiry still provided little or no opportunity for K.M. to demonstrate that she actually understood, especially since she felt she needed to answer in a way that would please the court and not make her "sound stupid."
Had her attorney or the court asked K.M. more open-ended questions like, "What does the right to remain silent mean, in your own words?" or "What does proof beyond a reasonable doubt mean?"as occurred at the later hearing on her motion to withdraw the admissionthe court would have quickly noticed that K.M. was essentially clueless and that a more thorough explanation and exchange was necessary. Thus, while I have stated above that juvenile courts do not have to "follow a `particular script' or any other `specific method of communicating the rights enumerated by rule [25],'" State v. Corwell, 2005 UT 28, ¶ 12, 114 P.3d 569 (quoting State v. Visser, 2000 UT 88, ¶ 13, 22 P.3d 1242), from a practical standpoint, a specially tailored means of communicating to juveniles the important rights they have, assuring they understand them, and verifying that they knowingly waive them is obviously in order.
[6] I hasten to add that the result my colleagues reach is no doubt "best" for K.M. Although I conclude that K.M. is legally entitled to withdraw her admission, I am perplexed by her decision to try to do so in light of the favorable disposition she received (state-supervised probation, 250 hours of community service, group counseling, a neuropsychological examination, and thirty days in secure confinement, which was stayed) and also considering the more serious charge she faced prior to reaching a plea agreement with the State. It is no small matter that if K.M.'s motion to withdraw her plea were granted, the State could revive the more severe charge of murder, a first-degree felony if committed by an adult. Indeed, K.M.'s counsel at oral argument on appeal, when questioned about the wisdom of this course of action, conceded that it was unwise and he had so informed his client, but he advised the court that he was, of course, ethically bound to follow his client's wishes and instructions.
[7] Unlike with motions to withdraw made after sentencing, which are typically prompted by "buyer's remorse" about the sentence rather than heartfelt concern about the voluntariness of one's plea in the abstract, there is little downside to granting a motion to withdraw that is promptly made. Contrary to the suggestion in footnote 8 of the main opinion, I readily recognize that juvenile courts should more skeptically approach a motion to withdraw an admission when dissatisfaction with a given disposition is a likely motivation behind the motion. This case, however, bears no sign of being motivated by even a slight case of buyer's remorse because of the juvenile court's gentle-handed disposition of the matter. K.M. received a very favorable disposition of her case, especially in light of the charges she was facing. See supra note 6. Indeed, this case presents almost the opposite of a buyer's remorse situation. In fact, K.M. does not seem upset in the least about her "punishment" and, if anything, is more upset, in hindsight, that she admitted to such a grave misdeed.