2007 UT 93

**STATE of Utah, in the interests of K.M., a person under eighteen years of age.**

**K.M., Petitioner.**

**No. 20060683.**

Supreme Court of Utah.

Dec. 4, 2007.

Mark L. Shurtleff, Att'y Gen., Joanne C. Slotnik, Asst. Att'y Gen., Narda Beas–Nordell, Michael O. Zabriskie, Salt Lake City, for the State.

Joan C. Watt, Debra M. Nelson, Salt Lake City, for K.M.

NEHRING, Justice:

## INTRODUCTION

¶ 1 The juvenile court accepted K.M.'s admission to child abuse homicide, an offense

that would be a third degree felony if committed by an adult. K.M. then sought to withdraw her admission. The juvenile court denied her motion, and the court of appeals affirmed. In this review on certiorari, we conclude that rule 25 of the Utah Rules of Juvenile Procedure, upon which the juvenile court relied in accepting K.M.'s admission, fails to afford due process of law to juveniles because it does not mandate that the juveniles understand the nature and elements of the offense to which they are admitting. The inadequate communication of the nature and elements of the offense, which rule 25 permitted, led the juvenile court to accept a plea that was at odds with the contents of K.M.'s admission and was therefore not entered into knowingly. We therefore reverse the court of appeals.

## BACKGROUND

¶ 2 K.M. did not know she was pregnant until she gave birth in the downstairs bathroom of her home. K.M. was fifteen years old at the time. On the day K.M. delivered the infant, she suffered from what she thought was severe menstrual cramping. To alleviate the pain, she took several Advil and soaked in a bath. After several hours of severe cramping, K.M. had an urge to run into the bathroom, and then she had the urge to push. When the infant's "little body fell into [her] arms," K.M. said that it made "[n]o movement, no sound." K.M. was confused by what had just happened and did not know what to do with the still, silent human form that inexplicably appeared next to her. She did not want to place the infant on the floor and chose instead to open the bathroom window and put the child in the window well. K.M. watched the little body for five or ten seconds. It did not appear to move or breathe or utter a sound. The birth occurred between 11:00 and 11:30 on the night of September 4, 2002.

¶ 3 K.M. experienced severe blood loss, and she failed to summon assistance from any of her family members before she eventually lost consciousness. After regaining consciousness, K.M. showered in an attempt to clean herself, but she continued to bleed.

She left the shower and attempted to reach her room. K.M. lost consciousness several more times before she made her way to her bed, where she passed out. At approximately two o'clock in the morning, K.M's mother discovered her in her bed covered in blood.

¶ 4 K.M.'s mother called K.M.'s aunt, who is a nurse and who had been tending K.M. throughout that day, and reported that something was terribly wrong with K.M. When K.M.'s aunt arrived, she estimated that K.M. had lost between 600 and 1000 cubic centimeters of blood and needed immediate medical attention. She knew the bleeding was vaginal and thought it might be a spontaneous hemorrhage, perhaps attributable to a tumor.[1] K.M.'s aunt told K.M.'s mother to call 911. She did, and paramedics arrived soon after.

¶ 5 K.M. was transported to the hospital. After an ultrasound and pelvic exam indicated that K.M. had recently given birth, K.M. told her mother about the little body she had left in the window well. K.M.'s aunt immediately returned to the house and found the lifeless body of a four-pound baby boy.

¶ 6 K.M. has an I.Q. between seventy-nine and eighty-four and multiple learning disabilities. She had been examined by two doctors in the last few months preceding the unexpected birth, but neither physician had diagnosed a pregnancy. According to K.M., she had her menstrual cycle two weeks prior to going into labor. She attributed her swollen abdomen to weight gain.

¶ 7 According to the medical examiner, the infant's partially inflated lungs indicated that the baby had been born alive. The medical examiner could not ascertain the cause of death but expressed the opinion that maternal neglect contributed to the infant's death.

¶ 8 The State filed a petition in juvenile court charging K.M. with one count of murder, a first degree felony if committed by an adult. After her trial on this charge had begun, K.M. reached a plea agreement with the State and agreed to admit to child abuse homicide, a third degree felony if committed

---

1. K.M.'s aunt and mother were concerned that K.M. might have developed a tumor because one of K.M.'s sisters had developed one years earlier and because K.M. appeared to be having severe menstrual symptoms that night.

by an adult. Pursuant to rule 25 of the Utah Rules of Juvenile Procedure, the juvenile court conducted a colloquy with K.M., assisted by K.M.'s counsel. The juvenile court asked K.M.'s counsel to "advise [K.M.] of her rights on the record." Counsel indicated that he had talked to K.M. at length about her rights and explained to her the nature of a trial. Counsel then explained to K.M. on the record the rights that K.M. was surrendering by admitting culpability. He described K.M.'s right to confront witnesses, her right against self-incrimination, and her right to appeal an unlawful sentence. He indicated that she would be able to withdraw the plea for good legal reason up until the time of sentencing. Then, acknowledging K.M.'s emotional state, counsel sought to elicit from K.M. an indication of whether she understood what was happening and whether she was willing to proceed. She responded that she understood the proceedings and that she wished to continue. The judge supplemented counsel's explanation of K.M.'s rights by telling her in simple terms that she had a right to call witnesses who could help her case and a right against self-incrimination. Neither K.M.'s counsel nor the judge advised her that she was presumed to be innocent unless and until the State proved beyond a reasonable doubt all of the elements the offense with which she was charged and that she would waive her right to testify at trial by admitting the crime.

¶ 9 The juvenile court then questioned K.M. about the events surrounding the birth and death of the infant. K.M. presented a detailed account of the circumstances surrounding the offense. She admitted that she now understood that she could have asked her aunt for help but explained that she was in shock at the time and that she did not know what was happening to her. Despite her willingness to enter the plea agreement, K.M. expressly refused to admit that the infant was born alive. Nevertheless, the juvenile court determined that, based on the medical evidence that the infant's lungs were partially inflated, there was sufficient factual basis for K.M.'s admission to one count of child abuse homicide and accepted her admission.

¶ 10 K.M. subsequently moved to withdraw her admission. She asserted that she "understood little or none" of the admission colloquy, that she was pressured into admitting the amended allegation, and that she did not realize that she was admitting to causing the death of the child. The juvenile court held a hearing on K.M.'s motion, and K.M. testified that she had questioned her admission immediately after entering it. K.M. explained that she did not understand the plea colloquy because of the "big words" and that she "didn't want to sound stupid [by] saying no." When the judge probed her understanding of basic legal concepts, she gave nonsensical answers. When asked by counsel what her right against self-incrimination meant, she answered, "I didn't know that I could take back the plea, I guess." When asked about her right to remain silent, K.M. responded, "I thought I could never talk again." K.M. explained the right to proof beyond a reasonable doubt as "[f]or a trial to become" and "[f]or a trial to come." After considering the evidence, the juvenile court denied the motion to withdraw and sentenced K.M. The judge imposed a suspended sentence of thirty days' detention, placed K.M. on probation, and ordered her to complete rehabilitation programs and 250 hours of community service.

¶ 11 After the juvenile court denied her motion to withdraw her admission, K.M. appealed. The court of appeals affirmed the juvenile court's denial of K.M.'s motion to withdraw. We granted certiorari to review two issues: (1) "[w]hether rule 25 of the Rules of Juvenile Procedure incorporates the provisions of rule 11 of the Rules of Criminal Procedure and/or additional requirements with respect to a juvenile court's colloquy with a juvenile at the time of accepting an admission to a criminal offense"; and (2) "[w]hether Petitioner's admission in this case was knowing and voluntary according to the requirements of due process applicable in juvenile proceedings."

## DISCUSSION

¶ 12 This case touches on a number of bedrock dilemmas that confront a society founded on the rule of law when the state is called upon to bring the power of that law to bear on persons who, because of their youth,

cognitive deficits, or other disabilities, are incapable of comprehending how or why they are being held to account for their behavior. The court of appeals' dissent presented the central dilemma in real world terms when it asked, "If a juvenile is too young to enter into a legally binding contract to purchase a set of tires, how can that same juvenile validly waive constitutional rights and enter into a legally binding plea agreement?" *K.M. v. State (State ex rel. K.M.)*, 2006 UT App 74, ¶ 30 n. 1, 136 P.3d 1230 (Orme, J., dissenting).

¶ 13 Our juvenile courts owe their existence to the legislature's recognition that the sharp edges of the law, which are necessary to achieve predictability and even-handedness when dealing with the affairs of adults, often inflict harm on children who come in contact with them. Thus, owing to a juvenile's stage of development, a juvenile's decisions about legal affairs may be influenced in varying degrees by the demands or expectations of family or peers. And an almost countless array of other forces—several of which are noted in the court of appeals' dissent—may diminish a child's ability to exercise the independent decision-making judgment we assume to be available to adults. *See State ex rel. K.M.*, 2006 UT App 74, ¶ 41, 136 P.3d 1230. Juvenile court judges are, therefore, called upon to a much greater degree than their adult counterparts to discern between applications of the law that are arbitrary and those that are apropos.

¶ 14 In few instances is a juvenile judge's power of discernment put to a greater test than when a juvenile appears before the judge seeking to admit guilt for committing a crime. Like an adult defendant, a juvenile charged with a crime is guaranteed protection against arbitrary infliction of the coercive power of the state by both the United States Constitution and the Utah Constitution. A juvenile is entitled to the benefits of these protections even in those instances where there is little doubt that the juvenile would also benefit from lessons imparted by

taking responsibility for one's conduct: displaying remorse, seeking forgiveness, and submitting herself to other similar remedies for human imperfection.[2]

¶ 15 Here, we conclude that K.M.'s admission was not made knowingly and voluntarily because she was not informed of and did not understand the nature and elements of the offense of child abuse homicide. A full understanding of one's conduct and of how and why that conduct made one culpable in the eyes of the law may be more important in the life of a juvenile than in the life of an adult. An important trait of a responsible citizen is the ability to have respect for and confidence in the rule of law and the institutions that put the rule of law into practice in the real world. The acquisition of this characteristic is unlikely to be nurtured if a juvenile is left to face consequences imposed by courts for behavior that is branded unlawful for reasons that are left unexplained. In its current form, rule 25 permits this uncertainty to occur by not requiring juveniles to be informed of the nature and elements of offenses at the time they admit culpability for them.

¶ 16 We ground our holding in our determination that rule 25 is constitutionally defective because it does not require a juvenile court judge to ensure that the juvenile understands the nature and elements of the crime to which she is admitting. This defect was exposed in this case by K.M.'s steadfast insistence during the admission colloquy that her child was never alive. K.M.'s refusal to admit that her child was born alive is one of the dilemmas driving this case through Utah's court system. The juvenile court judge clearly believed that K.M.'s insistence that her child was born dead was a matter of some legal importance. It is impossible to otherwise explain why the judge elected to invite a proffer of the medical examiner's conclusion that the baby had been born alive in an attempt to establish a factual basis for K.M.'s admission.

---

2. The court of appeals' dissent also aptly observes that the juvenile court's disposition imposed consequences on K.M. that could hardly be characterized as punitive. The combination of this favorable outcome and the possibility that upon remand of this case the State may elect to renew the murder charge it originally pursued against K.M. highlights yet another variation of the juvenile court dilemma, here in the form of honoring a tactical decision that most knowledgeable observers would consider highly ill-advised.

¶ 17 That K.M. did not admit that her baby was born alive acquires great value when we recognize that the uncontested facts in this case leave little doubt that K.M. could not have been adjudicated guilty of child abuse homicide without proof that her child was born alive.[3]  K.M.'s refusal to admit that the child was born alive is a singular circumstance that spawned multiple legal issues, most notably whether a sufficient factual basis supported K.M.'s admission and whether K.M. understood the nature of her admission.

¶ 18 In the court of appeals, the majority and the dissent each confronted the factual basis problem, but in different ways.  The majority, sidestepping the question of whether sufficient facts supported K.M.'s admission in the face of her denial that the child was born alive, maintained that the factual basis question was not preserved. *State ex rel. K.M.*, 2006 UT App 74, ¶¶ 16–18, 136 P.3d 1230.  The dissent, on the other hand, would have held that

> the factual basis behind the admission was adequately established by the autopsy of the baby, K.M.'s statement to the court regarding the birth of the baby, and K.M.'s own attorney's concession that there's no dispute about whether the baby was born alive[,] the puzzlement comes from what caused the baby to die.

*Id.* ¶ 32 n. 2 (Orme, J., dissenting) (internal quotation marks omitted) (alteration in original).  In our view, however, the legal consequences of K.M.'s insistence that her baby was not born alive are not put to rest by treating the matter as one of factual sufficiency; the factual sufficiency question, however, is ultimately resolved.  Rather, the fact of K.M.'s insistence that there was no live birth also looms over an assessment of whether K.M.'s admission was knowing and voluntary and whether rule 25 adequately safeguards a juvenile's right to due process of law.

¶ 19 The distinction between a claim of insufficient factual basis for the admission, which we did not agree to review, and a claim that the admission was not knowing and voluntary, which is within the scope of our grant

of certiorari, is both subtle and opaque.  We will therefore attempt to clarify our approach by introducing it through a closer assessment of the court of appeals' treatment of K.M.'s claim that her admission lacked factual support.  Examining the text of K.M.'s motion to withdraw her admission, which asserted that K.M. "was unaware that she was admitting to causing the death of [her] child," the court of appeals' majority concluded that K.M. "did not raise the issue of inadequate factual basis." *Id.* ¶ 17.  Instead, the court reasoned that "this assertion implied that K.M. *had* admitted to causing the baby's death, but had done so unwittingly." *Id.* (emphasis in original).  The majority appears to interpret "unwittingly" to imply that K.M. experienced an after-the-fact realization that she had misapprehended the nature of the proceedings.  We find that K.M.'s stated grounds for challenging her admission also imply that K.M. made her admission unwittingly because she did not fully understand the nature and elements of the offense to which she was admitting.  This interpretation was preserved in the juvenile court, and it forms the basis of our analytical approach to this case.  Moreover, it appears that the juvenile court actually ruled on the inadequate factual basis challenge, a fact that calls into question the court of appeals' majority's determination that the factual basis question was not preserved.  In its minutes and order relating to the motion to withdraw, the juvenile court found that K.M.'s admission was entered knowingly and voluntarily.  Specifically, the court explained, "[K.M.] was advised of all of her rights, she waived them voluntarily, *she gave a factual basis for her admission.*  There is no good cause to withdraw her admission ..." (emphasis added).

■ ¶ 20 Preserved or not, the factual sufficiency of K.M.'s admission is not before us. The effect of K.M.'s refusal to admit that her baby was born alive endures, however, and we now turn to analysis on how this circumstance compromised K.M.'s understanding of the nature of her admission.  This approach falls in line with our order granting certiora-

---

**3.**  We do not intend to suggest that a live birth is always necessary to sustain a conviction or adju-

dication for child abuse homicide;  it is not.

ri, where we asked whether there are any "additional requirements" in addition to those provided in rule 25 "with respect to a juvenile court's colloquy with a juvenile at the time of accepting an admission to a criminal offense" and where we asked whether K.M.'s admission "was knowing and voluntary according to the requirements of due process applicable in juvenile proceedings." We find that due process requires a juvenile court judge to ensure that a juvenile understand the nature and elements of the crime to which she admits, a requirement not currently reflected in rule 25. Further, we find that K.M. did not have a sufficient understanding of the nature of the crime to which she admitted in order to make her admission knowing and voluntary. We reiterate, however, that our fault-finding is directed at the shortcomings in rule 25 and not at the juvenile court judge who followed the rule and conducted a competent plea colloquy with K.M.

¶ 21 Much like rule 11 of the Utah Rules of Criminal Procedure, rule 25 of the Utah Rules of Juvenile Procedure establishes the procedure for taking admissions in juvenile court. Rule 11 has generated a prodigious body of jurisprudence in Utah's appellate courts, but rule 25 has not. We agree with the court of appeals that rule 11 caselaw is therefore of great value as a guide to the interpretation of rule 25. But we also find that a key feature of rule 11 that does not appear in the text of rule 25 causes rule 25 to be constitutionally defective. Unlike rule 11, rule 25 does not require the juvenile court judge to ascertain that the juvenile understands the nature and elements of the offense to which she is admitting. And in this case, the resulting absence of a discussion of the nature and elements of the offense within the admission colloquy between the juvenile court judge and K.M. has left us without sufficient confidence that K.M.'s admission was knowing and voluntary.

¶ 22 Rule 11(e)(4)(A) of the Utah Rules of Criminal Procedure, which imposes on a trial judge the responsibility to communicate to a defendant the nature and elements of each offense to which a plea is contemplated, together with its companion rule 11 requirements, reflects the exacting demands the law places on those who choose to surrender their right to make the state prove their guilt beyond a reasonable doubt. In *State v. Thurman*, we explained that, to ensure that a defendant's plea is " 'truly voluntary' " under the Constitution, the judge receiving the plea must "determine that the defendant 'possesses an understanding of the law in relation to the facts' " and must confirm "that the defendant understands the elements of the crime." 911 P.2d 371, 373 (Utah 1996) (quoting *State v. Breckenridge*, 688 P.2d 440, 444 (Utah 1983)). Due process, therefore, requires that the defendant "possess[ ] an understanding of the law in relation to the facts" for a plea to be knowing and voluntary. *Id.* (internal quotation marks omitted).

¶ 23 We conclude that juveniles who appear in juvenile court are also entitled to benefit from this due process protection. This conclusion is not based on our belief that the taking of juvenile admissions should simply follow in lock step with the mandates of rule 11. We are sensitive to the practical reality that due process takes on an altered form in juvenile courts because of the rehabilitative focus of the juvenile court system. *See generally In re Gault*, 387 U.S. 1, 14–21, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (explaining that "[f]rom the inception of the juvenile court system, wide differences have been tolerated—indeed insisted upon—between the procedural rights accorded to adults and those of juveniles" and recounting the "history and theory underlying this development").

¶ 24 The due process standard in juvenile proceedings is "fundamental fairness." *McKeiver v. Pennsylvania*, 403 U.S. 528, 543, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). And the United States Supreme Court has characterized its juvenile due process cases as having "an emphasis on factfinding procedures." *Id.* Still, if there is a legitimate policy-based rationale for limiting a juvenile's due process rights in the juvenile court context, it may be appropriate to limit those rights. For example, juveniles are guaranteed the rights of "notice, counsel, confrontation, cross-examination, and standard of proof." *Id.* Due process does not, however, require the juvenile court to provide juveniles with a trial by jury because "[t]he impo-

sition of the jury trial on the juvenile court system would not strengthen greatly, if at all, the factfinding function, and would, contrarily, provide an attrition of the juvenile court's assumed ability to function in a unique manner." *Id.* at 547, 91 S.Ct. 1976.

¶ 25 We can uncover no legitimate reason to withhold from juveniles the right to understand the nature and elements of the offense to which they propose to admit culpability and how the law relates to the facts of their cases. We have searched available archival sources and can find nothing to explain why this constitutional right was not included in rule 25. Further, we cannot think of such a reason. Therefore, although it is not presently a violation of rule 25 for the juvenile court to fail to ensure that a juvenile understand the nature and elements of the crime to which she is admitting, it does offend due process not to do so. Without an adequate communication of the nature and elements of the offense that is the subject of the admission, the admission is presumptively not knowing and voluntary.[4]

■ ¶ 26 In this case, K.M. did not possess a reasonable understanding of the law in relation to the facts of her case when she entered her admission. K.M. entered an admission to child abuse homicide, a third degree felony under Utah Code section 76–5–208(3) (2003). Child abuse homicide results if "the actor causes the death of a person under 18 years of age and the death results from child abuse, as defined in [Utah Code] Subsection 76–5–109(1)." *Id.* § 76–5–208(1). Further, child abuse homicide will be a third degree felony if the child abuse is done with criminal negligence.[5] *Id.* § 76–5–208(3)(b).

¶ 27 Because rule 25 did not require the juvenile court to ensure that the juvenile understood the nature and elements of the crime, the juvenile court in this case understandably did not dedicate a portion of the admission colloquy to ensure that K.M. understood the nature and elements of the crime to which she was admitting. The juvenile court did recite the elements of the crime when presenting the amended allegation to K.M., explaining that the allegation was amended to read that K.M. "with criminal negligence caused the death of a person under 18 years of age and [that] the death results from child abuse." The court then asked K.M., "Do you admit or deny that?" K.M. responded that she would "[a]dmit that," and the court proceeded to attempt to establish a factual basis for the plea. That, however, was the extent of the juvenile court's efforts to explain to K.M. the nature of the crime to which she was admitting, and we find that those efforts were constitutionally inadequate.[6]

¶ 28 In addition, further review of the admission colloquy and the hearing on the motion to withdraw demonstrates that K.M. did not understand the nature and elements of the crime to which she admitted. For example, K.M. never admitted that the child was born alive or that she had contributed, either directly or indirectly, to the death of the child. After K.M. entered her admission, the juvenile court proceeded to question K.M. about the events in question, seeking to establish a factual basis for the admission. In response to the court's request that K.M. recount everything that happened, K.M. told her story in great detail. At the conclusion of her account, the court then questioned

4. We decline at this time to articulate an amendment to rule 25 that would cure this constitutional defect. Such a task is better left to the traditional rulemaking procedures, where this court will have the advantage of working with a rulemaking committee and receiving comment on any proposed amendments to the rule.

5. Utah Code sections 76–5–109(3)(a) through (c) and 76–5–208(3) also provide that a child abuse homicide done intentionally, knowingly, recklessly, or with criminal negligence could constitute a third degree felony if the injury is not serious, which is bizarre, considering that this is a child abuse homicide statute.

6. The State notes that the juvenile court is required to inform the juvenile of the nature and elements of the crime being charged at the arraignment, as per rule 24 of the Utah Rules of Juvenile Procedure. But we do not believe that this rule helps the State's case for two reasons. First, the allegations at the arraignment may be different from the crimes to which the juvenile ultimately admits. Second, we believe that the time that elapses between the arraignment and the actual admission will often be sufficient for juveniles to forget or to get confused about the nature and elements of the crime to which they are admitting, such that their admission would not be knowing and voluntary.

K.M. about whether she thought the baby was born alive:

> THE COURT: [K.M.], did that child ever make a noise?
>
> [K.M.]: No, ma'am.
>
> THE COURT: Could you tell if the baby was ever breathing or not?
>
> [K.M.]: Yes, ma'am, I would have.
>
> MR. BRASS: She didn't understand the question. I heard it, but she—
>
> THE COURT: Was the baby breathing or not?
>
> [K.M.]: No, ma'am.
>
> . . . .
>
> THE COURT: Do you agree that the baby was born alive?
>
> [K.M.]: No, ma'am.

¶ 29 K.M.'s refusal to admit that the child was born alive or that she contributed to its death demonstrates that she was not aware of the nature and elements of the crime to which she was admitting. The closest that she came to admitting to indirectly causing the death of her child was in response to a series of leading questions by the juvenile court during the admission colloquy:

> THE COURT: [K.M.], why didn't you call out to your aunt or to your sisters?
>
> [K.M.]: I was in shock. I didn't know what was happening.
>
> THE COURT: But your aunt was there trying to help you through the whole night, wasn't she?
>
> [K.M.]: Yes.
>
> THE COURT: And you could have asked for help, couldn't you?
>
> [K.M.]: Yes.
>
> THE COURT: And you should have asked for help, shouldn't you?
>
> [K.M.]: Yes, I know that now.

Even putting aside the leading nature of the court's questions, K.M.'s acknowledgment that she should have asked for help does not contribute to an understanding of how K.M.'s failure to summon help could have resulted in the death of her already dead baby. Further, K.M. repeatedly testified at the hearing on the motion to withdraw her admission that she did not understand that she was admit- ting to "abusing the little body" and that she was not aware that she was admitting to causing the death of the child, even indirect- ly.

¶ 30 We are sensitive to the practical chal- lenges that accompany requiring juvenile court judges to ensure that the juveniles in their courtrooms understand the nature and elements of the offenses to which they are admitting culpability. The wide spectrum of ages, educational attainment, developmental maturity, whether the child has cognitive dis- abilities, and the child's experience with the legal system contribute to making difficult the necessary work of seeing to it that a juvenile fully comprehend the nature and elements of the offenses before her admitted culpability is formally acknowledged. These are the same difficulties, however, that juve- nile court judges face when performing many of their duties. The fact that juvenile court judges have proven to be so skillful at meet- ing these challenges removes any reluctance we might otherwise have to impose upon them this additional responsibility. To con- firm our confidence in juvenile court judges' ability to communicate the nature and ele- ments of an offense, we need look no further than the manner in which K.M.'s judge con- ducted the admission colloquy. The record reveals that she took extra precautions to ensure that K.M. was comfortable with the proceedings and that she understood the na- ture of the constitutional rights that she was waiving.

¶ 31 In sum, we conclude that, owing to a constitutional defect in rule 25's procedures for accepting a juvenile's admission, the juve- nile court judge did not adequately ensure that K.M. understood the nature and ele- ments of the offense for which she admitted culpability. Her admission of responsibility was therefore not knowing and voluntary, and her motion to withdraw her admission should have been granted. We reverse and remand.

## CONCLUSION

¶ 32 Due process requires that juveniles understand the nature and elements of the crime to which they are admitting before their admissions will be knowing and volun-

tary. Because the juvenile court did not take steps to ensure such an understanding in K.M. and because we find that K.M. did not obtain such an understanding, we find that her admission was not knowing and voluntary. She should therefore be allowed to withdraw her admission.

¶ 33 Chief Justice DURHAM, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING'S opinion.

WILKINS, Associate Chief Justice, concurring in the result:

¶ 34 More than 100 years ago the first American court devoted exclusively to the unique and difficult challenge of dealing with children charged with crimes was established in Chicago. Since then, in one form or another, every state in the Union has adopted special rules for dealing with children in court, generally by establishing a juvenile court. Utah joined this trend in the mid–1900s, and by the latest turn of the century our juvenile courts had achieved status equal to our district courts, but as courts of specified and limited statutorily delineated jurisdiction.

¶ 35 Utah's juvenile courts are charged with the protection of Utah's children from the abuse, neglect, or other harmful action of adults in their lives. They are also charged with the protection of other citizens and property from the wrongful acts of children, while recognizing the unique need to do all that is reasonable to salvage a child who has strayed from the path of acceptable behavior. As with all courts, our juvenile courts are designed to see that those responsible for wrongful acts face appropriate consequences. However, unlike our adult system, the appropriateness of the consequences is measured in part by the likelihood that a child's pattern of behavior can and will be modified in the direction of proper and acceptable behavior as a result. Salvaging an errant child is a high priority.

¶ 36 In the adult system, an individual responsible for the death of an infant will likely face incarceration and other consequences designed to both punish and remove from society for an extended period the perpetrator. In our adult correctional system, less effort is directed at correcting the underlying cause of the criminal behavior. Preventing recurrence is important, but is primarily accomplished through the threat of harsh punishment for future misdeeds.

¶ 37 Where an adult charged with the same behavior as the child defendant in this case could expect a term of years in prison, a child of K.M.'s age and maturity received services at state expense, counseling, treatment, and supervision. The consequences imposed on K.M. were designed to convince K.M. that her behavior was not acceptable in civilized society, to help her in a very aggressive way to understand and to overcome the circumstances that led to the death of her child, and to help her to mature and develop into a responsible and reliable adult.

¶ 38 To facilitate the different role of the juvenile court in dealing with acts that would be seen as serious crimes if committed by adults, we employ a slightly different system of justice. Juvenile proceedings are treated as civil, not criminal. Children are charged with offenses, not crimes. The offenses are defined as acts that *would be crimes if committed by an adult.* Inherent in this distinction is the policy of this state to treat offenses by children as something other than the crimes that an adult would be charged with as a result of the same actions.

¶ 39 We employ a different language. Allegations are admitted or denied. A child does not plead guilty or innocent. A charge against a child is found to be true or not true. A child is not found guilty or not guilty. A child does not enjoy the same unfettered right to self-representation afforded adults, for obvious reasons: a child is not assumed to be capable of making a mature and informed judgment regarding the risks of self-representation. We require the intervention of adult judgment, usually the concurrence of a parent, before we allow a child to represent herself in court. Children are not entitled to a jury of their peers in ascertaining the truthfulness of the allegations against them, again for obvious reasons. In the juvenile courts, we rely upon specialized judges steeped in the policy and theory of juvenile justice to select from the vast array of alter-

natives those most likely to meet the multiple goals of a juvenile court proceeding.

¶ 40 The distinction of greatest importance between adult and juvenile criminal justice process involves the role of adults acting for and on behalf of the accused. In a case such as that brought against K.M., we assign mature adults to act in the best interests of the child, even if the child does not agree with that action. The law assigns this role to the parents or legal guardians of the child in most circumstances. When there exists a doubt about the impartiality, devotion, maturity, or competence of the parent or guardian, the court is authorized and obligated to assign another skilled adult to the role: the guardian ad litem. In addition, when a child faces a serious charge, these adults are required to assure competent legal counsel is provided for the child.

¶ 41 Clearly, some children are incapable, because of their age, mental ability, maturity, social experience, or other reasons, of making sound and responsible decisions. That is a basic distinction between children and adults, and the single most important motivation for the establishment of a separate juvenile court system. Children who engage in behavior that would be considered serious crimes if committed by adults may, or may not, understand the seriousness or potential consequences of that behavior. They may, or may not, understand the process of the juvenile justice system, and the unique and multifaceted role of the juvenile court. They may, or may not, be *able* to understand these important distinctions. It is for this exact reason that we charge parents, guardians, counsel, and guardians ad litem with the responsibility to think and understand for the child, and to make decisions best suited for the child's well-being and future. We expect these adults to understand, and to apply their maturity, reason, and concern for the child, to the decisions required.

¶ 42 As a consequence of the special care, significantly enhanced treatment and protection options, services, and reduced penalties available to a child confronting a charge in juvenile court, we do not extend to the child all of the adult protections of our criminal justice system. To date, recognizing the more limited role of the child in the decision process of the juvenile justice system, we have not required what might well be fruitless and wasted efforts to include a child in the difficult decisions affecting their future. As a matter of state and national policy, we have declined to grant directly to children the full scope of criminal due process and other constitutional protections ordinarily afforded accused adults. Instead, we focus our efforts on protecting them from the life-long consequences of acts committed when adult judgment and mature experience are as yet not available to them.

¶ 43 In this instance, K.M. was charged with the wrongful death of her newborn son. Her immaturity is clearly demonstrated by her reaction to the birth of her child. At fifteen she was pregnant but did not recognize it. She was surprised by the birth of her child. She did not know what to do. She did not seek help from her mother, with whom she was living. She put the little body in the window well, took a shower, and went to sleep. When the situation was later discovered by her mother, the infant was dead. Her intellectual ability is limited, testing at an I.Q. level of between 79 and 84.

¶ 44 In the course of the investigation and trial, K.M. was convinced to admit wrongdoing in the death of her infant son in exchange for a reduction in the charge by the prosecution. She had been charged with murder, a first degree felony *if committed by an adult.* That charge was reduced to child abuse homicide, a third degree felony *if committed by an adult* in exchange for her admission of culpability. Her defense counsel, and her mother, saw the admission as in K.M.'s self-interest. K.M. admitted that she delivered the baby and put him in the window well without seeking any other help for herself or the infant. In response to inquiry from the juvenile judge, K.M. said she did not know the infant was alive when born. Between the judge and K.M.'s defense counsel, K.M. was told that she was giving up certain rights in making the admission. These rights parallel some, but not all, of the rights afforded adult criminal defendants under the constitution.

¶ 45 At issue in this appeal is the question of whether or not K.M.'s plea was constitutionally defective. The focus of concern is on the extent of the effort made by the judge to assure that K.M. personally understood the nature and elements of the offense to which she was admitting responsibility. My colleagues today extend another degree of constitutional protection to the child herself. I would not.

¶ 46 Under our juvenile court system of criminal justice, it is not critical that the child defendant fully comprehend the nature and elements of the offense that would be a crime *if she were an adult* before the allegations are admitted. What is critical is that those admissions made by the child be factually true, and that those adults specifically charged by the law with applying mature judgment on behalf of the child fully understand the nature and elements of the charge and the consequences that will flow to the child as a result her admission. As part of the very nature of juvenile court, the child must be fully involved in the decisions, and accept responsibility for her actions. However, it is the very absence of adult capacity to understand and appreciate the circumstances that has placed the child in the juvenile court system in the first place.

¶ 47 I dissent from the opinion expressed by my colleagues to the extent that they mandate that the juvenile court assure that the juvenile understand the nature and elements of the offense to which the admission is made. While certainly a desirable state of affairs, and one to be sought in every instance, it is contrary to the interests of the children involved to elevate that desire to a constitutional right.

¶ 48 Some children charged with very serious offenses are simply incapable of fully comprehending the nature and elements, the potential consequences, and the choices before them. Nonetheless, it may be very much in their best interest to agree to a reduced charge, both in terms of short-term consequences, and in terms of life-long impacts. If a duty exists to assure the informed nature of an admission, it must fall to the adults specifically and exclusively charged with the protection of the child's interests: parents, guardians, counsel, and guardians ad litem. It is counterproductive, contrary to the policy underpinning the juvenile court system as a whole, and unnecessary to place that responsibility on the judge.

¶ 49 I would leave rule 25 unchanged, accept admissions made on adequate facts, and recognize the unique and valuable distinctions between adult criminal and juvenile civil process.

¶ 50 That said, I still would reverse the court of appeals and remand the matter to the juvenile court. In this particular case, the child did not admit the predicate facts sufficient to find the allegations true. Whether or not K.M. understood that the charge required proof or admission that the infant was born alive, it did so require. And K.M. did not admit that necessary fact. Consequently, the admission was insufficient to support the charge as a matter of statutory law. I would reverse the conviction and remand the matter for a new trial on that basis.