*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 79**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

R. G. and D.G.,[1]
*Appellants,*

*v.*

STATE OF UTAH,
*Appellee.*

Nos. 20141046 and 20141047
Filed: November 15, 2017

On Certification from the Court of Appeals

Third Juvenile Court
The Honorable Kimberly K. Hornak
Nos. 1095932 and 1095934

Attorneys:

Sam N. Pappas, Monica Maio, Salt Lake City, for appellants

Sean D. Reyes, Att'y Gen., John L. Nielsen, Asst. Sol. Gen.,
Kristin L. Zimmerman, Salt Lake City, for appellee

JUSTICE DURHAM authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PEARCE joined.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1    D.G. and R.G. were accused of aggravated sexual assault in juvenile court. Both D.G. and R.G. filed a motion to suppress their post-*Miranda* statements regarding the sexual assault to a detective during an interview at their school. The juvenile court held an evidentiary hearing and denied the motion to suppress the post-

---

[1] *In re R.G.* and *In re D.G.* have been consolidated for purposes of this opinion.

*Miranda* statements. Both interviews with the detective regarding the sexual assault were introduced at trial. D.G. and R.G. were adjudicated delinquent for committing aggravated sexual assault. The court of appeals certified the case to this court; we have jurisdiction pursuant to Utah Code section 78A-3-102(3)(b).

¶2 We hold that the juvenile court did not err in denying D.G.'s and R.G.'s motion to suppress their post-*Miranda* statements. And, considering the totality of the circumstances surrounding their waivers, we hold that D.G. and R.G. knowingly and voluntarily waived their *Miranda* rights during the interview with the detective at their school.[2]

## BACKGROUND

¶3 Near the beginning of the school year in 2013, two fourteen-year-old boys, D.G. and R.G. went over to another male friend's house after school. After receiving a phone call from R.G., the victim and her friend, also both fourteen years of age, took the bus and joined D.G. and R.G. at the friend's house. D.G., R.G., and the third friend drove to the bus stop to pick up the two girls. While at the house, R.G. held a box cutter to the victim's throat and engaged in nonconsensual sexual intercourse with the victim. D.G., the other

---

[2] We emphasize that although our conclusion that the waiver in these cases was knowing and voluntary, this holding should not be read to foreclose the ability of juveniles in future cases to advance both case-specific and general evidence and argument, including expert testimony, to show either that they did not knowingly and voluntarily waive their rights or that the test we employ to assess the validity of a juvenile waiver is scientifically flawed and in need of modification or overhaul. We recognize that the science of juvenile development is a rich, relevant, and rapidly evolving area that bears directly on the issues before us. *See generally* Hayley M. D. Cleary, *Police Interviewing and Interrogation of Juvenile Suspects: A Descriptive Examination of Actual Cases*, 38 L. & HUM. BEHAV. 271 (2014); Eric Y. Drogin & Richard Rogers, *Juveniles and* Miranda: *Current Research and the Need to Reform How Children Are Advised of Their Rights*, 29-WTR CRIM. JUST. 13 (2015), Jean Pierce, Note, *Juvenile* Miranda *Waivers: A Reasonable Alternative to the Totality of the Circumstances Approach*, 2017 BYU L. Rev. 195. We acknowledge in these instances that these constitutional arguments and related evidence are not adequately before us. Based on the record evidence in these cases, we find no error in the proceedings below.

boy in the room during the sexual assault, also engaged in nonconsensual oral sex with the victim.

¶4 A few months later, the victim reported the sexual assault involving D.G. and R.G. to the West Valley City police. A West Valley City detective conducted individual interviews with D.G. and R.G. at their school in the school resource officer's office without a parent present for either minor. D.G. was interviewed first, and R.G.'s interview followed.

¶5 At the beginning of D.G.'s interview, the detective told D.G. why he was there and described his role as a detective. He asked D.G.: "You know what we do, right, police detectives? You know, we investigate things that may be crimes." The detective told D.G., "I just have to let you know that you don't have to talk to me." He then recited the *Miranda* rights to D.G. without pausing to check for understanding until after the rehearsed speech. Following the warning, the detective informed D.G. that he could "stop answering questions at any time and [he could] request counsel at any time during questioning." He asked D.G., "Do you understand those rights?" Then, the detective informed D.G. that he was not under arrest and he was not telling him anything to make him scared. The detective again asked, "Having those rights in mind, can I let you know [why] I'm here, you want to talk to me, tell me what is going on?" D.G. agreed to talk with the detective and eventually confessed to participating in non-consensual sex with the victim at the request of R.G.

¶6 As R.G.'s interview began, the detective said to R.G.: "The law makes sure and requires me to tell you what your rights are, okay?" The detective then recited the *Miranda* warning to R.G. from memory. His recitation was without the intonation and inflections that normally gives meaning and nuance in verbal speech. The volume of his voice lowers, and he speaks quickly in a well-rehearsed speech. The detective then asked R.G. the following questions: "Do you understand those rights?" "Having those rights in mind, can I talk to you?" and "Do you want to talk to me?" R.G. then proceeded to talk to the detective, eventually confessing to actions that amount to aggravated sexual assault.

¶7 In February 2014, the state filed a petition in juvenile court alleging aggravated sexual assault against D.G. and R.G. based on testimony from the victim and the confessions obtained in these interviews. D.G. and R.G. each filed a Motion to Suppress Statements and Request for Evidentiary Hearing, arguing that their *Miranda* waivers to the detective during the interviews at the school were not "made knowingly and voluntarily in violation of the Fifth and

Fourteenth Amendments." Each later filed an amended motion to suppress.

¶8 The juvenile court held an evidentiary hearing regarding the *Miranda* waivers and the motion to suppress. Both of the boys' mothers and the detective testified at the hearing. The juvenile court denied D.G.'s and R.G.'s motions to suppress their testimony given during their interviews with the detective, and the statements were later introduced at trial. The juvenile court found that the detective asked D.G. and R.G. questions to be sure they understood their rights and that D.G. and R.G. were honors students capable of understanding their rights, and held that the *Miranda* rights waivers were valid.

¶9 After a bench trial, the juvenile court adjudicated both D.G. and R.G. delinquent for committing aggravated sexual assault. D.G.'s sentence included state supervised probation, completion of an early intervention program, a five-day detention, a Sexual Behavior Risk Assessment (SBRA), 150 hours of community service, and a requirement to provide fingerprints, a photograph, and a DNA specimen. R.G.'s sentence included state supervised probation, 150 hours of community service, one day of detention, an SBRA, a requirement to provide fingerprints, a photograph, and a DNA specimen, a no-contact order with D.G., and completion of an early intervention program.[3] D.G. and R.G. filed motions to stay their sentence and timely appealed. The record is silent on the court's

---

[3] In this appeal, we have not been asked to review the sentence, but note the difficult and multivariate facets of sentencing juvenile delinquents. Aggravated sexual assault is a crime that if committed by an adult would lead to a sentence of 15 years to life. UTAH CODE § 76-5-405(2)(a)(i). Juvenile courts have the difficult task of balancing the consequences of the adjudicated delinquents with the hope for rehabilitation and providing victims assurance that the court takes personal violations such as this seriously, realizing the likely significant physical and psychological harm. *See infra* ¶¶ 13–16. We also note that juveniles adjudicated delinquent based on aggravated sexual assault are considered "sex offenders" under Utah Code section 77-41-102 and will likely be required to register as sex offenders, which has a significant negative impact on their future prospects for education and employment. *See* UTAH CODE § 77-41-105; *see also* Marsha Levick & Riya Saha Shah, *The Momentum Builds: Challenging Lifetime Registration of Juveniles Convicted of Sexual Offenses in the Post-*Roper *Era*, N.Y.U. *Review of Law & Social Change: Panel Series on Sex Offender Registration Laws*, 40 HARBINGER 115 (2016).

decision regarding D.G.'s motion to stay. The juvenile court granted R.G.'s Motion to stay the SBRA, DNA sample, and fingerprinting pending appeal, but not the community service.

¶10 The issue now before this court is whether D.G. and R.G. knowingly and voluntarily waived their *Miranda* rights during the interview with the detective at their school. We hold that the *Miranda* warnings given to D.G. and R.G. were sufficient according to the standards this court and the United States Supreme Court have set, and that both D.G. and R.G. knowingly and voluntarily waived their *Miranda* rights. Accordingly, we hold that the juvenile court did not err in denying the motion to suppress their post-*Miranda* statements.

## STANDARD OF REVIEW

¶11 "We review for correctness a trial court's ultimate ruling regarding the validity of a *Miranda* waiver, while 'granting some degree of discretion to the trial court because of the wide variety of factual settings possible.'" *State v. Bybee*, 2000 UT 43, ¶ 16, 1 P.3d 1087 (citations omitted). The findings of fact of the trial court are reviewed for clear error. *Id.*

## ANALYSIS

¶12 We begin our analysis by discussing the unique purposes and development of the juvenile justice system. We then turn to a discussion of *Miranda* and its application to juvenile suspects. Finally, we analyze D.G.'s and R.G.'s rights with these sets of facts and under these particular circumstances.

### I. JUVENILE COURTS AND MODERN-DAY JUSTICE

¶13 For more than 50 years, the juvenile court system in Utah has been "charged . . . with the protection of other citizens and property from the wrongful acts of children, while recognizing the unique need to do all that is reasonable to salvage a child who has strayed from the path of acceptable behavior." *State ex rel. K.M.*, 2007 UT 93, ¶¶ 34–35, 173 P.3d 1279 (Wilkins, A.C.J., concurring). The purpose of juvenile courts is to "promote public safety and individual accountability," "order appropriate measures to promote guidance and control," adjudicate matters, and "consistent with the ends of justice, act in the best interest of the minor in all cases and preserve and strengthen family ties." UTAH CODE § 78A-6-102(5).[4]

---

[4] Many of the juvenile justice provisions in the Utah Code were amended in the 2017 general session and are in effect as of August 1,

(continued . . .)

¶14 The juvenile court systems across the United States have evolved from the idea of a grandfatherly figure (not necessarily a judge) providing guidance and counsel to wayward youth, to the use of courts that resemble adult courts in almost every aspect. In Utah, these reforms include the creation of the Utah Youth Court Diversion Act. *Id.* § 78A-6-1201 to -1210. This program provides alternative options for qualified juveniles to be referred out of the juvenile court system and receive varied dispositions of their case. *See Id.* § 78A-6-1205. Furthermore, specialized judges "steeped in the policy and theory of juvenile justice" are tasked with "select[ing] from the vast array of alternatives those most likely to meet the multiple goals of a juvenile court proceeding." *State ex rel. K.M.*, 2007 UT 93, ¶ 39. The changes in the juvenile court system have led to improvements in constitutional protections for juveniles. But we acknowledge the difficult task juvenile courts face in balancing the need and desire to help and re-orient troubled youth with the demands of justice for their criminal behavior.

¶15 Although the juvenile court system now more closely resembles adult courts, some variances still exist. Recognizing the differences in adult and juvenile behavior and culpability, "we employ a slightly different system of justice" for each. *Id.* ¶ 38. For example, juvenile courts are closed proceedings, use different language and terminology, and require adult intervention (either through parents, legal guardians, or guardians ad litem). *Id.* ¶ 39. They also take age, experience, and emotional maturity into consideration when considering their ability to give consent, waive rights, and suffer consequences.

¶16 Because of the "significantly enhanced treatment and protection options, services, and reduced penalties available . . . we do not extend to the child all of the adult protections of our criminal justice system." *Id.* ¶ 42 ("As a matter of state and national policy, we have declined to grant directly to children the full scope of criminal due process and other constitutional protections ordinarily afforded accused adults. Instead, we focus our efforts on protecting them from the life-long consequences of acts committed when adult judgment and mature experience are as yet not available to them."). For example, juveniles are not entitled to a jury of their peers and consequences in the juvenile courts are "measure[d] in part by the likelihood that a child's pattern of behavior can and will be modified

---

(continued . . .)
2017. *See* H.B. 239, 62d Leg., Gen. Sess. (Utah 2017). These reforms are inapplicable here but may affect assessments in future cases.

in the direction of proper and acceptable behavior as a result" of the designated consequences. *Id*. ¶ 35.

## II. *MIRANDA* WAIVERS AND MINORS

¶17 In *Haley v. Ohio*, the Supreme Court recognized that minors can be "easy victim[s] of the law" and cannot be "judged by the more exacting standards of maturity." 332 U.S. 596, 599 (1948). Later, in *Fare v. Michael C.*, the Supreme Court imported a totality of the circumstances test regarding whether a minor is able to waive *Miranda* rights, constitutionalizing a standard regarding minors' rights to knowingly, voluntarily, and intelligently waive their rights. 442 U.S. 707, 724–25 (1979).[5]

¶18 In Utah, the process of determining whether juveniles are capable of knowingly and voluntarily waiving their rights begins with Utah Rule of Juvenile Procedure 27A, which governs the admissibility of statements given by minors without a parent or legal custodian present. When the minors are under 14, the presumption is that they are not capable of waiving their rights without a parent figure present under rule 27A(a)(1). Since both minors in this case were at least 14, we focus on rule 27A(a)(2), which states that "if the minor is 14 years of age or older, the minor is presumed capable of knowingly and voluntarily waiving the minor's rights without the benefit of having a parent, guardian, or legal custodian present during questioning."[6] Only after this determination do we proceed

---

[5] While not raised in this case, we note that juveniles are not entirely "independent actors with individual rights. . . . [P]olice questioning of minors also threatens the rights of parents, 'perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court.'" Note, *Juvenile* Miranda *Waiver and Parental Rights*, 126 HARV. L. REV. 2359, 2359 (2013) (third alteration in original) (*quoting Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)). When government actors "threaten[] to break 'familial bonds, [they] must provide the parents with fundamentally fair procedures.'" *Id.* (*quoting Santosky v. Kramer*, 455 U.S. 745, 754 (1982)). Interrogation without the presence of an interested adult "creates a substantial risk that children will be removed from their parents after confessing falsely" and may also "cause psychological harm that damages the parent-child relationship." *Id.*

[6] D.G. and R.G. argued in their briefs that the presumption in Utah Rule of Juvenile Procedure 27A(a)(2) is unconstitutional under *Tague v. Louisiana*, 444 U.S. 469 (1980). We do not reach this issue because it was not preserved below. Counsel argued before this

(continued . . .)

to the totality of the circumstances test to determine whether *Miranda* rights were validly waived by a minor as outlined in *State v. Bybee*, 2000 UT 43, ¶ 17, 1 P.3d 1087. This includes considering the following factors:

(1) Age,

(2) Intelligence,

(3) Education,

(4) Experience,

(5) The minor's ability to comprehend the meaning and effect of his statement,

(6) Whether the police used any coercive tactics in obtaining the waiver, and

(7) Whether a parent, adult friend, or attorney was present.

*Id.*

---

(continued . . .)
court that the exceptional circumstances exception to preservation applies because our court of appeals pointed this issue out in its certification to this court. But the court of appeals' identification of an issue *sua sponte* in a certification order is not the type of "rare procedural anomaly" that meets the exception to preservation rule. *In re Adoption of K.A.S.*, 2016 UT 55, ¶ 19, 390 P.3d 278. Additionally, while the juvenile court cited this rule as a factor in its analysis, it did not rely solely on this presumption to find that R.G. and D.G. validly waived their rights. Rather, it correctly weighed the elements outlined in *Bybee*. We do not decide the constitutional dimensions of this rule in this case, but it is within our domain to refer this rule to our rulemaking committee under the broader policy questions that exist in light of the growing body of research available on child and adolescent development and the ability of children to understand and waive their rights, and low recidivism rates. *See generally* Jenny E. Carroll, *Brain Science and the Theory of Juvenile* Mens Rea, 94 N.C. L. REV. 539 (2016); Christopher Northrop & Krisitina Rothley Rozan, *Kids Will Be Kids: Time for a "Reasonable Child" Standard for the Proof of Objective Mens Rea Elements*, 69 Me. L. Rev. 109 (2017); LAURENCE STEINBERG ET AL., U.S. DEP'T JUSTICE, OFFICE JUVENILE JUSTICE & DELINQUENCY PREVENTION, PSYCHOSOCIAL MATURITY AND DESISTANCE FROM CRIME IN A SAMPLE OF SERIOUS JUVENILE OFFENDERS (2015); Drogin & Rogers, *supra* note 2. *But see* Terry A. Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 NOTRE DAME L. REV. 89 (2009).

¶19 As in all *Miranda* waiver cases, "the State bears the burden of showing that the accused gave a valid waiver of his *Miranda* rights prior to making incriminating statements during custodial interrogation." *State v. Dutchie*, 969 P.2d 422, 427 (Utah 1998). This includes a consideration of "[a]ge" and [w]hether a parent, adult friend, or attorney was present," regardless of the presumption established in Rule 27A(a)(2). *Bybee*, 2000 UT 43, ¶ 17.

¶20 However, once the State has met the burden of showing that the waiver was otherwise valid (knowing, voluntary, and intelligent), the minor, along with being able to contest all factors in the totality of the circumstances test, can also offer evidence to overcome the presumption of rule 27A "by a preponderance of the evidence showing the . . . inability of the minor to comprehend and waive the minor's rights." UTAH R. JUV. P. 27A(b).

## III. THE JUVENILE COURT DID NOT ERR IN DENYING THE MOTION TO SUPPRESS THE POST-*MIRANDA* STATEMENTS

¶21 The juvenile court held an evidentiary hearing on D.G.'s and R.G.'s motion to suppress their post-*Miranda* statements. It addressed each of the seven factors to be considered in the totality of circumstances test in its Findings of Fact and Conclusions of Law regarding the evidentiary hearing. We now address each factor for each defendant in turn.

### A. The Totality of the Circumstances Supports that D.G. Knowingly and Voluntarily Waived His Miranda Rights

¶22 First, the juvenile court found D.G. to be 15 years of age. There is nothing about D.G.'s age alone that overcomes his waiver. Additionally, D.G. affirmed that he understood his rights when asked by the detective. The court further found that there was "no evidence that [D.G.] did not understand the Detective," nor was there any evidence that "he was confused or scared." D.G. did not provide any evidence to rebut his affirmative statement that he understood his rights.

¶23 Second, as to D.G.'s intelligence, the juvenile court found that D.G. had "straight A's in school [and was] an honor student." The court also found that D.G. was of "above average intelligence." Nothing from these findings weighs against D.G.s ability to intelligently waive his rights.

¶24 Third, when considering education, the juvenile court found that D.G.'s education level was "appropriate for his age" and there was no evidence that "he ha[d] any learning or mental disabilities." D.G. also "read at a ninth grade or even higher level." These facts do not give any cause for concern regarding D.G.'s education that

would weigh against his ability to knowingly waive his rights under the totality of the circumstances test.

¶25 Fourth, the juvenile court found that D.G. had no prior experience with law enforcement or the court system. While this weighs against his ability to knowingly waive his rights, this factor alone is not enough to overcome the weight of the other factors that indicate a valid waiver.

¶26 Fifth, as to D.G.'s ability to comprehend the meaning and effect of his statements, the juvenile court also found that D.G. "understood his rights." Additionally, there is no evidence that during the interview D.G. was scared or confused or felt intimidated in any way so as to impair his comprehension.

¶27 Sixth, no coercive tactics were used by the officer during the interview. The juvenile court found that the detective asked D.G. questions to be sure he understood his rights. Specifically, the detective asked D.G. "Do you understand those rights?" "Does that make sense?" "Can I let you know why I'm here? You want to talk to me, tell me what is going on?" The detective also informed D.G. that he could stop answering questions at any time and request an attorney at any time during the interview. Additionally, the detective told D.G. that he was not telling him his rights "to make him scared" and that he was not under arrest. We find no evidence in the record that any intimidation tactics or coercion by the detective would invalidate D.G.'s waiver. The interview was relatively short and occurred at a place that was familiar to D.G.[7] There was no evidence of any threats or promises in exchange for speaking to the detective.

¶28 Last, we consider the fact that D.G. did not have a parent, legal guardian, or attorney present during the interview with the detective. D.G. did not ask for a parent or attorney to be present during the interview even though D.G. was informed he could have an attorney present. As we have previously stated, "while the

---

[7] We do not address the issue of custody or determine whether "a reasonable [student would] have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (citation omitted). However, in the future there may be an "opportunity to address the need to alter the custody analysis for interrogations taking place in the school setting." Kelli L. Ceraolo, Note, *Custody of the Confined: Consideration of the School Setting in* J.D.B. v. North Carolina, 91 NEB. L. REV. 979, 980 (2013).

presence of a parent or an attorney is a factor that should be considered by the court, it is not determinative, and the lack thereof does not make the waiver invalid per se." *State v. Dutchie*, 969 P.2d 422, 429 (Utah 1998).[8] This is only one factor to consider among the other factors.

¶29 The state met its burden of showing that the waiver was knowingly, intelligently, and voluntarily given in this case. D.G. did not offer adequate evidence that would counter a finding that he knowingly and voluntarily waived his rights. Considering the totality of the circumstances including D.G.'s age, intelligence, ability to comprehend the questions asked by the detective after giving the *Miranda* warnings, and lack of coercive tactics used by the detective, we hold that the *Miranda* warnings were sufficient.

¶30 Further, D.G. did not "overcome by a preponderance of the evidence" the presumption in rule 27A that D.G. is "capable of knowingly and voluntarily waiving [his] rights without the benefit of having a parent, guardian, or legal custodian present during questioning." UTAH R. JUV. P. 27A. The juvenile court did not err in denying D.G.'s motion to suppress his post-*Miranda* statements to the detective.

*B. The Totality of the Circumstances Support that R.G. Knowingly and Voluntarily Waived His Miranda Rights*

¶31 First, the juvenile court found that R.G. was 15 years of age, and that "the law clearly provides that a juvenile 14 or older can be interviewed without a parent," (citing *State v. Bybee*, 2000 UT 43, 1 P.3d 1087). Accordingly, without further evidence to the contrary, R.G.'s age by itself does not overcome the finding by the juvenile court that his *Miranda* waiver was valid.

¶32 Second, as to R.G.'s intelligence, "all the evidence would indicate that R.G. is of average intelligence." No evidence was presented to indicate that he had any learning disabilities or was

---

[8] Although not a decisive factor in this case, we note that neither the school nor the detective called D.G.'s nor R.G.'s parents to inform them that the interviews were taking place. This is concerning. This is a particular problem in school settings. Police officers in urban areas who interview juvenile suspects at school are less likely to contact the parents of juveniles than police officers in suburban areas. Note, *Juvenile* Miranda *Waiver and Parental Rights*, 126 HARV. L. REV. 2359, 2372–73 & nn. 150–52 (2013).

failing any classes. Nothing about R.G.'s intelligence weighs in favor of invalidating his *Miranda* waiver.

¶33 Third, we consider R.G.'s education. All evidence indicates that he has the "appropriate education level of a fifteen-year-old." There is nothing in the record to indicate that he is in any resource or special classes or that there is any cause for concern regarding his education level.

¶34 The fourth factor is R.G.'s experience with law enforcement or the court system. R.G. has had no prior experience with law enforcement or the court system. However, this alone does not outweigh the other factors that favor a holding of validity.

¶35 Fifth, as to R.G.'s ability to comprehend the meaning and effect of his statements, the juvenile court found that R.G. "understood his rights." There is no evidence that R.G. was confused or scared during the interview. As the juvenile court found, R.G. answered the detective's questions affirmatively, that he understood his rights, and that he indicated that he wished to speak with the detective.

¶36 Sixth, no coercive tactics were used by the officer during the interview. The juvenile court found that the detective asked R.G. four questions to be sure he understood his rights. Specifically, the detective told R.G.

> The law makes sure and requires me to tell you what your rights are, okay? Not to scare you. It doesn't mean you're under arrest. You're not going anywhere. The law just says if I want to talk to you, I just have to tell you that, I'm required to do that. So that's what I'm going to do first, okay?

Then after giving the *Miranda* warning, the detective asked, "Do you understand those rights?" "Having those rights in mind, can I talk to you?" "Do you want to talk to me?" Nothing in the record indicates that the detective threatened R.G. in any way.

¶37 Seventh, we consider the fact that R.G. did not have a parent, legal guardian, or attorney present during the interview with detective. R.G. did not ask for a parent or attorney to be present during the interview even though R.G. was informed he could have an attorney present. The state also met its burden of showing that the waiver was knowingly, intelligently, and voluntarily given in R.G.'s case. R.G. did not provide evidence that would counter a finding that he knowingly and voluntarily waived his rights. Considering the totality of the circumstances including R.G.'s age, intelligence, ability to comprehend the questions asked by the detective after

giving the *Miranda* warnings, and lack of coercive tactics used by the detective, we hold that the *Miranda* warnings were sufficient.

¶38 The State met its burden of showing that the waiver was knowingly, intelligently, and voluntarily given in this case. R.G. did not offer adequate evidence to counter a finding that he knowingly and voluntarily waived his rights. Considering the totality of the circumstances including R.G.'s age, intelligence, ability to comprehend the questions asked by the detective after giving the *Miranda* warnings, and the lack of coercive tactics used by the detective, we hold that the *Miranda* warnings were sufficient.

¶39 Further, R.G. did not "overcome by a preponderance of the evidence" the presumption in rule 27A that R.G. is "capable of knowingly and voluntarily waiving [his] rights without the benefit of having a parent, guardian, or legal custodian present during questioning." UTAH R. JUV. P. 27A. The juvenile court also did not err in denying R.G.'s motion to suppress his post-*Miranda* statements to the detective.

## CONCLUSION

¶40 Although the interviews conducted by the detective might not be a model of best practices regarding the delivery of the *Miranda* warnings to a minor and the inquiry into the juvenile's understanding of his rights,[9] we hold that under the totality of the

---

[9] Best practices might include notifying a parent or guardian of the minor before he or she is interviewed; having a parent or guardian present during an interview; videotaping of interviews; providing the *Miranda* warning in "language comprehensi[ble] to a juvenile," as well as stopping to check for understanding after each right is explained, having the juvenile repeat each right in his own words; and interviewing the juvenile in a setting that is perceived as non-custodial (where the juvenile would feel free to leave) rather than in a setting where free movement of students is implicitly constricted, like a school setting. Ceraolo, *supra* note 7, at 991–96; *see also* Drogin & Rogers, *supra* note 2. R.G.'s and D.G.'s arguments appear to push this court to adopt a per se rule that these best practices must be followed for a juvenile to validly waive his *Miranda* rights. While these may be best practices that would make it much easier to find a valid waiver, the constitution does not mandate that these procedures be strictly followed in every case. The constitution only mandates that the juvenile knowingly, intelligently, and voluntarily waive his *Miranda* rights given the totality of the circumstances. *See Fare v. Michael C.*, 442 U.S. 707, 724–25 (1979).

circumstances including the *Miranda* warnings were sufficient in these cases. The juvenile court did not err in denying D.G's or R.G.'s motions to suppress their post-*Miranda* statements to the detective.[10] The evidence surrounding the totality of the circumstances shows that both D.G. and R.G. knowingly, voluntarily, and intelligently waived their *Miranda* rights during their interviews with the detective at their school.

---

[10] We note the problematic balance of affording a juvenile delinquent the benefits of rehabilitation—individualized assessment, adjudication, and consequences—with the demands of due process, particularly in the case of *Miranda* warnings. From a policy standpoint, it might be that encouragement of confession in the confines of a juvenile court is in the best interest of both the juvenile and society, upholding the ideal of supporting troubled youth who are more amenable to rehabilitation. *See supra* ¶ 13; *see also* LAURENCE STEINBERG ET AL., *supra* note 6. Parents also seem to agree with this stance, more often than not encouraging their child to confess. *See* Pierce, *supra* note 2, at 219. However, antithetical policy issues arise when juveniles are bound over to criminal court and tried as adults or receive consequences that last beyond their juvenile years (such as mandatory sex offender status). *See* UTAH CODE §§ 78A-6-602(3), -701 through -704 (describing when juveniles may be or must be removed from the jurisdiction of the juvenile court and transferred to a district court in Utah); *id*. § 77-41-102(17)(f) (describing juveniles who qualify as "[s]ex offender[s]"). Without the protective umbrella of the juvenile court in these cases especially, "admissions and confessions of juveniles require special caution," because "a mere child" is "an easy victim of the law." *In re Gault*, 387 U.S. 1, 45 (1967) (citation omitted). *See also* Pierce, *supra* note 2, at 205–11, 217 (noting the research supporting the inability of children to voluntarily, knowingly, and intelligently waive their *Miranda* rights and advocating for "a fixed procedural requirement that juveniles must first consult with an attorney before making a valid waiver").